The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
June 10, 2021

## 2021COA81

**No. 17CA2076, *People in Interest of J.R.* — Juvenile Court — Delinquency — Sexual Assault on a Child — Indecent Exposure; Evidence — Opinions and Expert Testimony — Testimony of Experts — Evidence of Character and Conduct of Witness**

After a jury trial, the juvenile defendant was adjudicated delinquent for acts that if committed by an adult would constitute sexual assault on a child and indecent exposure. On appeal, he contends that the juvenile court plainly erred in allowing a medical doctor to testify that, based solely on one of the child victim's allegations, she had diagnosed that victim with "sexual abuse." A division of the court of appeals holds that the doctor's expert testimony impermissibly bolstered the victim's credibility and usurped the jury's role as fact finder. However, the division concludes that the error, while obvious, does not cast serious doubt on the reliability of the jury's verdict. And because the division

rejects the juvenile's other argument concerning prosecutorial

misconduct, it affirms the judgment.

COLORADO COURT OF APPEALS      **2021COA81**

Court of Appeals No. 17CA2076
City and County of Denver Juvenile Court Nos. 15JD925 & 15JD945
Honorable Laurie A. Clark, Judge

The People of the State of Colorado,

Petitioner-Appellee,

In the Interest of J.R.,

Juvenile-Appellant.

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE HARRIS
Román and Lipinsky, JJ., concur

Announced June 10, 2021

Philip J. Weiser, Attorney General, Daniel J. De Cecco, Assistant Attorney
General Fellow, Denver, Colorado, for Petitioner-Appellee

Megan A. Ring, Colorado State Public Defender, Ryann S. Hardman, Deputy
State Public Defender, Denver, Colorado, for Juvenile-Appellant

¶ 1     After a jury trial, J.R. was adjudicated delinquent for acts against two victims that, if committed by an adult, would constitute sexual assault on a child and indecent exposure.

¶ 2     On appeal, his primary argument is that the juvenile court plainly erred by allowing a medical doctor to testify that, based on one victim's statements, she had diagnosed the victim with "sexual abuse."  Although we conclude that the juvenile court erred, we also conclude that admission of the testimony did not constitute plain error warranting reversal.  And because we reject J.R.'s other argument concerning prosecutorial misconduct, we affirm.

## I.     Background

¶ 3     The charges against J.R. arose from allegations made by A.M. and her cousin E.P.  After A.M.'s parents separated, she stayed part of each week with her father (E.P.'s uncle), who lived with his girlfriend and her son, J.R.

¶ 4     In 2011, when A.M. and E.P. were both eight years old and J.R. was thirteen, A.M. told her mother that J.R. had touched her vaginal area.  During a subsequent forensic interview, A.M. described sexual contact by J.R. and said that E.P. had been present when it occurred.  Following the allegations, the girls were

no longer permitted to stay overnight at father's home, but their parents allowed them to visit after school when father was there.

¶ 5 Four years later, during an argument in which her parents angrily confronted her about her troubling behavior, E.P. reported that J.R. had been sexually abusing her for years. In additional forensic interviews, the girls reported multiple instances of sexual abuse by J.R. The prosecution filed delinquency petitions charging J.R. with six counts of sexual assault on a child, two counts of indecent exposure, and six aggravated juvenile offender sentence enhancers.

¶ 6 Both A.M. and E.P. testified at trial, and their recorded forensic interviews were admitted into evidence. Family members described the victims' outcries and a social worker provided context for the girls' statements and conduct.

¶ 7 Through counsel, J.R. denied any abuse. The defense argued that the abuse would have been seen or heard by one of the adults who was always present when the girls visited father's home. The defense's theory was that A.M. had fabricated the allegations as part of her mother's plan to obtain sole custody, and that E.P. had

fabricated the allegations to deflect attention from, and to avoid the consequences of, her own bad behavior.

¶ 8    The jury found J.R. guilty on all counts.

## II.    Expert Witness Testimony

¶ 9    J.R. contends that the juvenile court erred by admitting a medical doctor's testimony that, based only on E.P.'s consistent statements, she had diagnosed E.P. with "sexual abuse."

### A.    Additional Background

¶ 10    At trial, Dr. Katherine Snyder, a child abuse pediatrician, testified as an expert in the areas of pediatric medicine and child sexual assault.  Her testimony focused on her examination of E.P.

¶ 11    According to Dr. Snyder, "concerns had been raised" that E.P. had been sexually abused, and Dr. Snyder was brought in to "do the medical piece of the evaluation."  She testified that a sexual abuse exam and diagnosis follows the same procedure as any other medical exam and diagnosis — it includes a "head-to-toe" physical examination and a discussion with the patient and family to obtain a medical and social history.

¶ 12    In E.P.'s case, Dr. Snyder asked the victim only limited "basic questions" because E.P. had already undergone a forensic interview,

3

and the doctor did not "want to make her go through all of those details again." Dr. Snyder testified that during the exam, E.P. reported that J.R. had penetrated her vagina with his penis, causing pain and bleeding.

¶ 13    E.P.'s physical examination was "normal," according to Dr. Snyder, with no signs of physical trauma. She explained, however, that E.P. tested positive for bacterial vaginosis, a condition typically associated with sexual intercourse but not necessarily a sign of sexual abuse.

¶ 14    The prosecutor then asked Dr. Snyder if she had made a diagnosis:

> [PROSECUTOR]: So, at the conclusion of your examination with [E.P.], did you reach any sort of diagnosis?
>
> [DR. SNYDER]: I did.
>
> [PROSECUTOR]: Okay. What was your diagnosis?
>
> [DR. SNYDER]: I diagnosed her with sexual abuse.
>
> [PROSECUTOR]: Okay. Can you explain that to the jury.
>
> [DR. SNYDER]: Yes. So, as we just talked about, we don't need physical findings, right, to diagnose sexual abuse. If you read the most

up-to-date literature, technically all you need is consistent disclosure, meaning the child has told you something, and it's not just told you something, but it's really this child had told the same information to multiple people by the time she had seen me, and the information she told me was the same information she had told other individuals, including people not within her family. So, it was like in her forensic interview, like independent sources. When you have a child or even a teenager who is giving you clear detailed information and it's consistent over repeated tellings, that is very consistent with a diagnosis, and that's all you need to diagnose sexual abuse.

¶ 15    Dr. Snyder also testified briefly about A.M., who had been examined by Dr. Snyder's colleague. Dr. Snyder did not testify that she or her colleague had diagnosed A.M. with sexual abuse.

### B.    Standard of Review

¶ 16    A trial court has broad discretion to determine the admissibility of expert testimony under CRE 702, and we will not overturn its ruling absent a showing of an abuse of that discretion. *People v. Mintz*, 165 P.3d 829, 831 (Colo. App. 2007). A trial court abuses its discretion if its ruling was manifestly arbitrary, unreasonable, or unfair, or if it misconstrued or misapplied the law. *See People v. Relaford*, 2016 COA 99, ¶ 25.

¶ 17    Because defense counsel did not object to the challenged testimony, we review for plain error. *Id.* at ¶ 36. An error is plain, and therefore requires reversal, if it was obvious and "so undermined the fundamental fairness of the trial itself . . . as to cast serious doubt on the reliability of the judgment of conviction." *Hagos v. People*, 2012 CO 63, ¶ 14 (citation omitted).

## C.    Analysis

¶ 18    J.R. contends that Dr. Snyder's testimony that she had diagnosed E.P. with sexual abuse, based solely on E.P.'s allegations, was the functional equivalent of an expert opinion that E.P. was credible. Therefore, he says, admission of the testimony violated the rules prohibiting an expert from vouching for another witness's truthfulness and from usurping the jury's role as fact finder. We agree, but we conclude that the error in admitting the testimony was not plain.

### 1.    Admissibility of the Evidence

¶ 19    Under the Colorado Rules of Evidence, a witness may offer expert testimony if she has "scientific, technical, or other specialized knowledge" that "will assist the trier of fact to understand the evidence or to determine a fact in issue," and she is

qualified as an expert based on that knowledge.  CRE 702.  Still, other rules and principles constrain an expert's testimony.

¶ 20    While an expert in a child sexual assault case can testify about the general characteristics and behavior of sexual abuse victims, *see People v. Fasy*, 829 P.2d 1314, 1318 (Colo. 1992) (expert testimony concerning post-traumatic stress disorder is admissible to explain child victims' behaviors); *Relaford*, ¶¶ 28-30 (an expert may testify as to the typical demeanor and behavioral traits displayed by a sexually abused child and collecting cases), the expert may not testify — directly or indirectly — that the victim is credible or that she was telling the truth on a particular occasion, *see* CRE 608(a); *Venalonzo v. People*, 2017 CO 9, ¶¶ 32-33; *see also People v. Snook*, 745 P.2d 647, 648 (Colo. 1987) (social worker's testimony that children tend not to fabricate stories of sexual abuse was inadmissible because it was tantamount to testimony that the child victim was telling the truth in that case).

¶ 21    And while expert testimony is not objectionable merely because it embraces an ultimate issue to be decided by the jury, CRE 704; *People v. Rector*, 248 P.3d 1196, 1203 (Colo. 2011), an expert witness cannot "tell the jury what result to reach or form

7

conclusions for the jurors that they are competent to reach on their own," *People v. Baker*, 2019 COA 165, ¶ 14, *aff'd*, 2021 CO 29; *see also Venalonzo*, ¶ 32 (The danger in admitting testimony that a child victim is truthful "lies in the possibility that it will improperly invade the province of the fact-finder.").

¶ 22     "The line between opinion testimony that improperly bolsters a witness's credibility and admissible testimony that may only collaterally enhance the witness's credibility is sometimes a difficult one to draw." *People v. Battigalli-Ansell*, 2021 COA 52M, ¶ 50.  But here, we have no difficulty in concluding that Dr. Snyder's testimony crossed the line into impermissible opinion testimony that E.P.'s allegations were credible, and that sexual abuse had occurred.

¶ 23     Dr. Snyder testified that based on E.P.'s "clear," "detailed," and "consistent" allegations, she had diagnosed E.P. with "sexual abuse."  The only purpose of this testimony was to bolster E.P.'s credibility.  *See Venalonzo*, ¶ 36 (the only purpose of the expert's testimony comparing child victims' behavior to that of other child sex assault victims was to bolster the children's credibility).  While Dr. Snyder did not say directly that she believed E.P., her testimony

8

could only be understood as an expert opinion that E.P.'s allegations were so objectively credible that, even in the absence of any corroborating physical symptoms, they could properly form the basis of an unequivocal diagnosis. *See Baker*, ¶ 20 ("Though [the expert] didn't specifically tell the jury that she thought the [witnesses] were telling the truth, she spoke as though their allegations were true, which suggested that she had drawn her own conclusions about the [witnesses'] credibility.").

¶ 24    Similar facts were presented in *People v. Gillispie*, 767 P.2d 778 (Colo. App. 1988). There, a pediatric specialist who had examined the child victim wrote a report indicating that the child's allegations of assault "were very detailed and specific." *Id.* at 780. At trial, the expert testified that the details were important to her evaluation, and when asked if she had made a diagnosis, the witness answered, "I believe the child, I felt that she was sexually abused." *Id.* The division concluded that the witness's opinion about the child's veracity was "clearly improper." *Id.*

¶ 25    The doctor's testimony in this case is nearly identical to the testimony in *Gillispie*, the only difference being that Dr. Snyder did not explicitly say that she believed E.P.; rather, that opinion was

9

implicit. But it is equally improper for an expert to bolster a child victim's credibility indirectly as it is to do so directly. In *Snook*, for example, the expert testified that "children tend not to fabricate stories of sexual abuse" and that, "in order to make these things up, there has to be a basis for that experience . . . ." 745 P.2d at 648. The supreme court reasoned that although the expert "couched her testimony in general terms, the opinion testimony necessarily refer[red] to [the victim's] character for truthfulness." *Id.* at 649. At bottom, the testimony was "an expert opinion that [the victim] is almost certainly telling the truth." *Id.*

¶ 26 The People contend that the doctor merely offered a medical diagnosis, rather than a personal assessment of E.P.'s credibility. We disagree. The Michigan Supreme Court recently rejected that same argument in a well-reasoned opinion, *People v. Thorpe*, 934 N.W.2d 693 (Mich. 2019). In that case, a medical doctor opined that the child victim, whose examination showed no physical evidence of an assault, suffered "probable pediatric sexual abuse." *Id.* at 710. Her diagnosis was based "solely on her own opinion that [the child's] account of the assaults was 'clear, consistent, detailed and descriptive.'" *Id.* The court of appeals had found no obvious

10

error in the trial court's admission of the testimony, on the theory that the doctor had "merely stated a medical diagnosis based on established diagnostic criteria, *all of which were explained to the jury.*" *Id.* at 704 (citation omitted). But the supreme court disagreed, concluding that the testimony was "nothing more than the doctor's opinion that the victim had told the truth." *Id.* at 710 (quoting *People v. Smith*, 387 N.W.2d 814, 818 (Mich. 1986)). The court held that a doctor's testimony is not admissible if based solely on what the victim told the doctor because the jury could, and should, evaluate the victim's testimony itself. *Id.*; *see also State v. Bainbridge*, 241 P.3d 1186, 1187 (Or. Ct. App. 2010) (nurse's testimony that she had diagnosed the victim with sexual abuse impermissibly vouched for the victim's credibility because, absent physical findings, the diagnosis "necessarily was based on her assessment of the child's believability" (quoting *State v. Lupoli*, 234 P.3d 117, 125 (Or. 2010)).

¶ 27     The same is true here. Because Dr. Snyder's expert opinion was based solely on E.P.'s allegations, about which E.P. testified at trial, the jury could determine for itself whether E.P. was credible

11

and whether her testimony supported a finding that she had been sexually abused.

¶ 28    In this way, Dr. Snyder's testimony not only improperly bolstered E.P.'s credibility, but it usurped the jury's role as fact finder.  The testimony resolved one of the ultimate legal issues in the case — whether E.P. had been sexually abused.  "[E]xpert opinion that a rape or sexual assault actually occurred is inadmissible," as the jury is likely to defer to an expert, whose opinions are cloaked in an "aura of special reliability and trustworthiness."  *People v. Koon*, 724 P.2d 1367, 1371 (Colo. App. 1986).  Whether the sexual abuse occurred was a disputed issue in this case, so whether E.P. was "telling the truth about what happened was a matter solely for the jury's determination."  *Baker*, ¶ 20.

¶ 29    True, as we have noted, an expert may, when certain requirements are satisfied, testify on an ultimate issue to be decided by the jury.  But the requirements were not satisfied here.

¶ 30    To determine whether expert testimony usurped the function of the jury, we examine whether (1) the testimony was clarified on cross-examination; (2) the expert's testimony expressed an opinion

12

of the applicable law or legal standards; (3) the jury was properly instructed that it may accept or reject the expert's opinion; and (4) the expert opined that the defendant committed the crime or that there was a particular likelihood that the defendant committed the crime. *Rector*, 248 P.3d at 1203.

¶ 31     Dr. Snyder's testimony concerning her diagnosis of sexual abuse suggested that the relevant legal standard had been met. In *Rector*, the doctor acknowledged that the legal definition of child abuse differs from the medical definition, and he declined to offer a legal definition of child abuse. *Id.* at 1199. But here, there was no evidence presented of any difference between legal and medical definitions of sexual abuse. And because Dr. Snyder's diagnosis was based solely on E.P.'s allegations, the same evidence the jury would assess in reaching a verdict, the jury was likely to conclude that Dr. Snyder's diagnosis referred to a legal standard.

¶ 32     Moreover, although Dr. Snyder did not directly implicate J.R. in her testimony, she did so indirectly. She testified that E.P. had identified J.R. as the abuser. Then, she effectively told the jury that she had accepted E.P.'s history as truthful and accurate and had therefore relied on it exclusively in reaching her diagnosis of sexual

13

abuse. Thus, the jury would likely have inferred that Dr. Snyder's expert opinion encompassed the identification of J.R. as the perpetrator. *Cf. id.* at 1203 (doctor did not testify that the defendant committed the abuse); *People v. Weeks*, 2015 COA 77, ¶ 91 (expert testimony that the victim had been subjected to child abuse and nonaccidental trauma did not usurp jury's role where the expert did not opine regarding whether the defendant inflicted the injuries or whether those injuries fit the legal definition of child abuse).

¶ 33 Because Dr. Snyder's testimony impermissibly bolstered E.P.'s credibility and usurped the jury's role as fact finder, the juvenile court erred by admitting it.

## 2. The Error Was Not Plain

¶ 34 As we have explained, an error is plain if it is obvious and substantial, meaning that the error is so egregious that it causes us to question the reliability of the judgment. *See Hagos*, ¶ 14.

¶ 35 Although the error in admitting Dr. Snyder's testimony was obvious, it was not so substantial that it casts serious doubt on the reliability of the verdict.

> Whether the erroneous admission of testimony that a child victim was credible is plain error "turns to a considerable extent on both the strength and breadth of the properly admitted evidence, the extent and significance of the improper evidence or testimony, and the reliance, if any, of the prosecution in closing arguments on the improper evidence."

*Relaford*, ¶ 43 (quoting *People v. Cook*, 197 P.3d 269, 276 (Colo. App. 2008)).

¶ 36    First, because E.P. testified and her forensic interview was admitted, the jury could evaluate her credibility "firsthand." *People v. Anderson*, 183 P.3d 649, 652 (Colo. App. 2007); *People v. Eppens*, 979 P.2d 14, 18 (Colo. 1999) (error in admitting testimony that bolstered credibility of the victim was mitigated by the fact that the victim testified at length, "providing the jury with a full opportunity to judge her credibility"). E.P.'s testimony, her forensic interview statements, and the testimony of family members to whom she had described the abuse showed consistency in her accounts and could have provided a basis, independent of Dr. Snyder's improper testimony, for the jury to credit her allegations. *See Gillispie*, 767 P.2d at 780-81 (where child victim described the assaults to four different people and each disclosure was consistent, pediatric

15

specialist's testimony that she "believe[d] the child" and "felt that she was sexually abused" was harmless).

¶ 37     Second, because Dr. Snyder acknowledged that her diagnosis was based entirely on E.P.'s own self-reporting, the risk that the jury simply deferred to her opinion is lower than it would be in a case where the expert suggests that her opinions are based on information not shared with the jury. *Cf. Baker*, ¶ 22 (admission of expert's improper testimony was not harmless because expert implied that she knew more about the facts than the jury did); *see People v. McFee*, 2016 COA 97, ¶¶ 77-79 (police officer's testimony about what the defendant had said on a recording was improper, but because jury could listen to the recording for itself, it "had no reason to accept [the officer's] opinion").

¶ 38     Third, there was evidence corroborating E.P.'s allegations. E.P., her mother, and her grandmother all testified that when E.P. was eight years old, two years before she started menstruating, she came home from her father's house and went into the bathroom, where she noticed a rash on her vagina and blood in her underpants. And Dr. Snyder testified that she diagnosed E.P. with bacterial vaginosis, a condition associated with sexual activity. *See*

*People v. Gaffney*, 769 P.2d 1081, 1088-89 (Colo. 1989) (doctor's testimony that child victim's history, which included a statement that defendant had sexually assaulted him, was "very believable" was harmless because statement to doctor was corroborated by other evidence, including results of the physical exam).

¶ 39    Finally, in the context of the entire trial, at which nineteen witnesses, including another expert, testified, Dr. Snyder's improper testimony was not prominent.  And the prosecutor did not mention her testimony during closing arguments except with respect to her diagnosis of bacterial vaginosis.  *See Relaford*, ¶ 48 (no plain error from admission of improper expert testimony where prosecutor did not emphasize testimony in closing argument).

¶ 40    We therefore conclude that the erroneous admission of the challenged testimony did not amount to plain error.

### III.    Prosecutorial Misconduct

¶ 41    J.R. also contends that the prosecutor committed reversible misconduct during opening statement and closing argument.  We are not persuaded.

## A. Preservation and Standard of Review

¶ 42    When reviewing claims of prosecutorial misconduct, we engage in a two-step analysis. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010). We first determine whether the prosecutor's conduct was improper under the totality of the circumstances and then determine whether the conduct warrants reversal under the proper standard of review. *Id.*

¶ 43    Defense counsel objected to the prosecutor's comment asking the jury to "vindicate" the victims, but J.R. did not preserve his claim as to the prosecutor's other challenged statements. Thus, we apply a harmless error standard in reviewing the prosecutor's "vindicate" statement, *see Crider v. People*, 186 P.3d 39, 44 (Colo. 2008), but a plain error standard in reviewing the other challenged statements, *People v. Vialpando*, 2020 COA 42, ¶ 34. "To constitute plain error, misconduct must be flagrant or glaring or tremendously improper . . . ." *People v. Weinreich*, 98 P.3d 920, 924 (Colo. App. 2004), *aff'd,* 119 P.3d 1073 (Colo. 2005).

## B. Instances of Alleged Misconduct

### 1. Appeal to Jurors' Emotions and Sympathy

¶ 44    J.R. says that the prosecutor improperly attempted to appeal to the jurors' emotions and sympathy when he

- referred to the "stigma of being sexually assaulted" and the "shame and embarrassment of being engaged in sexual acts" at a young age;

- characterized sexual assault as a "heinous crime"; and

- asked the jury to "vindicate" the victims and to "hold [J.R.] accountable."

¶ 45    The prosecutor's references to the "stigma" of sexual assault and the "shame and embarrassment" a child victim might feel, as well as his characterization of sexual assault as a "heinous crime," were attempts to explain why the victims in this case were unlikely to have fabricated the allegations against J.R.:

> [The defense is] saying that those two girls, [A.M. and E.P.], want to falsely join themselves among those who have to carry the stigma of being sexually assaulted; that those two girls want to feel or have to go through the shame and embarrassment of being engaged in sexual acts at an age that is not normal, and that they're telling their family that, even though it didn't happen.

19

> The implication is that those two girls are willing to suggest, not just that [J.R.] committed a crime, but committed a heinous crime, and they're ok with it.

¶ 46    A prosecutor is afforded considerable latitude in responding to the defense's theory of the case.  *See People v. Wallace*, 97 P.3d 262, 269 (Colo. App. 2004).  Under the circumstances, the prosecutor was entitled to counter the defense's attack on the credibility of the child victims.  *See People v. Krutsinger*, 121 P.3d 318, 324 (Colo. App. 2005).

¶ 47    The prosecutor's request that the jurors "vindicate" the victims by holding J.R. accountable comes closer to the line.  A prosecutor should not encourage the jury to depart from its duty to decide the case on the evidence by suggesting that guilty verdicts are necessary to do justice for a sympathetic victim, *People v. McBride*, 228 P.3d 216, 223 (Colo. App. 2009), or by appealing to the "emotionalism . . . of the jurors," *People v. Eckert*, 919 P.2d 962, 967 (Colo. App. 1996).  But even if we assume that the comment was improper, any error in allowing it was harmless.  The comment was likely to be interpreted by the jury as merely an overly dramatic and inartful way of asking the jury to return a guilty verdict based

on the evidence. *See People v. Romero*, 2015 COA 7, ¶ 49 (error in allowing prosecutor's comment that the jury should "[d]o [its] job" and "[h]old [the defendant] accountable" was harmless because comments were a request for jurors to come to a decision based on the evidence presented at trial).

### 2. Expressing Personal Opinions

¶ 48 J.R. says that the prosecutor expressed his personal opinion when he

- said that testifying about sexual abuse was hard for young children;

- said that "girls do not want to be victims of sexual assault";

- argued that it would be "cruel" for the girls to fabricate sex assault allegations against J.R.; and

- told the jury during opening statement that "you're going to find [A.M. and E.P.] credible."

¶ 49 J.R. argues that the first three comments implied that the prosecutor "had expertise in such matters, perhaps derived from his position as a deputy district attorney," and the fourth comment constituted impermissible vouching.

¶ 50    A prosecutor improperly bolsters a witness's testimony by implying that the testimony is corroborated by evidence known to the State but not the jury, and a prosecutor improperly vouches for a witness's credibility by indicating a personal belief in the witness's credibility. *People v. Coughlin*, 304 P.3d 575, 582 (Colo. App. 2011). We cannot conclude that a reasonable jury would have inferred from the prosecutor's first three statements that he had some special knowledge about children that bolstered the victims' testimony. Rather, we are confident that the jurors assumed the prosecutor was speaking from everyday experience and common sense.

¶ 51    In context, the prosecutor's statement that the jury would find the victims credible was not improper. At the end of his opening statement, in which he discussed some counterintuitive issues associated with child victims, the prosecutor said, "[B]ut at the conclusion of this trial, when you consider . . . their credibility, you're going to find them credible." We interpret that statement as a permissible reference to evidence that would be subsequently adduced at trial. *See People v. Manyik*, 2016 COA 42, ¶ 26.

22

### 3. Denigrating the Defense

¶ 52    J.R. says the prosecutor denigrated the defense when he

- characterized the defense theory that A.M. and E.P. had fabricated the allegations as a "cruel narrative" and

- accused the defense of "trying to hide" a fact.

¶ 53    A prosecutor may "employ rhetorical devices and engage in oratorical embellishment," but he may not denigrate defense counsel or imply that the defense is not being asserted in good faith. *People v. Carter*, 2015 COA 24M-2, ¶ 70 (quoting *People v. Collins*, 250 P.3d 668, 678 (Colo. App. 2010)). The prosecutor's statements amounted to mere oratorical embellishment and cannot reasonably be viewed as denigrating the defense. *See People v. Serpa*, 992 P.2d 682, 686 (Colo. App. 1999) (permissible for counsel to make remarks suggesting that defense evidence was designed as a "diversion" to "sidetrack" the jury because they drew from evidence at trial).

### 4. Lowering the Burden of Proof

¶ 54    J.R. says that the prosecutor lowered the burden of proof when he made the following comment in opening statement:

> This is not going to come out clean, because sexual assault on child cases don't, because it's too hard for 8 and 9 and 12 and 13-year-old girls to talk about, but at the conclusion of this trial, when you consider . . . their credibility, you're going to find them credible, and when that happens, they will be vindicated and you will hold [J.R.] accountable.

Unlike J.R., we do not interpret the prosecutor's statement as a request that the jury "excuse any gaps in the evidence." Instead, we agree with the People that the prosecutor was referring to the complicating factors inherent in child sexual assault cases and was not attempting to lower the burden of proof. *See Domingo-Gomez v. People*, 125 P.3d 1043, 1051 (Colo. 2005) (court should give prosecutor the benefit of the doubt where remarks are ambiguous or inartful).

## IV. Conclusion

¶ 55    The judgment is affirmed.

JUDGE ROMÁN and JUDGE LIPINSKY concur.