The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
April 5, 2018

## 2018COA46

**No. 15CA413, *People v. Fortson* — Crimes — Sexual Assault on a Child; Evidence — Character Evidence — Other Crimes Wrongs or Acts; Criminal Law — Prosecutorial Misconduct**

In this appeal of a conviction for sexual assault on a child, a division of the court of appeals considers whether the prosecutor engaged in significant misconduct that deprived the defendant of a fair trial.

The majority concludes that the prosecutor committed misconduct when she repeatedly introduced, referenced, and argued to the jury that the defendant previously committed uncharged sexual assaults against four other girls and the victim. The prosecutor did not seek the admission of the alleged uncharged sexual assaults for a proper purpose under section 16-10-301, C.R.S. 2017, CRE 404(b), or *Spoto*, and then improperly used this

evidence for propensity purposes. Therefore, the majority concludes reversal is required.

The special concurrence agrees that the prosecutor engaged in serious misconduct, but would reverse when considering the prosecutorial misconduct in conjunction with the improper use of expert testimony. The dissent would affirm.

COLORADO COURT OF APPEALS                                   **2018COA46**

Court of Appeals No. 15CA0413
Fremont County District Court No. 13CR376
Honorable Patrick W. Murphy, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Ricardo Lee Fortson,

Defendant-Appellant.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE LICHTENSTEIN
Berger, J., specially concurs
Webb, J., dissents

Announced April 5, 2018

Cynthia H. Coffman, Attorney General, Marissa R. Miller, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Douglas K. Wilson, Colorado State Public Defender, Alan Kratz, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     A jury found Ricardo Lee Fortson guilty of one count of sexual assault on a child based on alleged sexual intercourse with a fourteen-year-old girl, J.W. (Count One), and one count of sexual assault on a child as a part of a pattern of abuse based on alleged oral sex with her (Count Two).

¶ 2     Fortson contends on appeal that the prosecutor engaged in prejudicial misconduct throughout the trial by eliciting and referencing two categories of other uncharged sexual acts as propensity evidence: sexual acts Fortson allegedly committed on other children, and sexual acts Fortson allegedly committed against J.W. prior to the two charged incidents.[1]  At trial, defense counsel failed to object to all but one instance of misconduct.

---

[1] Fortson also alleged that the prosecutor improperly (1) vouched for the credibility of the prosecution's DNA expert; (2) denigrated the defense's DNA expert; (3) misstated the DNA evidence; (4) vouched for the truthfulness of J.W.; and (5) argued that a witness favorable to the defense had been "coached."

We only address the alleged instances of prosecutorial misconduct involving references to uncharged sexual assaults by Fortson because the repeated nature of this misconduct requires reversal irrespective of the propriety of the other alleged instances of misconduct.  *Wend v. People*, 235 P.3d 1089, 1102 n.6 (Colo. 2010).

¶ 3    The central issue on appeal is whether this pervasive misconduct so infected the jury's consideration of the evidence that we cannot deem the guilty verdict reliable.

¶ 4    We conclude that it did; therefore, we reverse the convictions and remand for a new trial.

## I.    Background

¶ 5    The jury heard the following evidence at trial pertaining to the two charged incidents.

¶ 6    As to Count One: when J.W. was fourteen years old, she spent the night at her friend B.B.'s house where Fortson also was staying. After watching a movie with her friend's family, everyone went to bed except J.W. and Fortson.  J.W. testified that, when only the two of them were present, Fortson had sexual intercourse with her.

¶ 7    The next day, J.W. went to a pregnancy crisis center with her mother and told a counselor at the center that she had had sexual intercourse with Fortson the night before.  As required by law, the counselor reported this allegation to the police.

¶ 8    J.W. also participated in a series of interviews.  While J.W. consistently maintained that she had sexual intercourse with Fortson on the night in question, other details regarding her

contacts with Fortson were inconsistent and disputed by other witnesses. There was no male DNA in a vaginal swab taken from J.W. Two DNA experts agreed there was male DNA on J.W.'s underwear, but disagreed as to whether the DNA came from semen. They also disagreed about the significance of the conclusion that Fortson could not be excluded as a possible source.

¶ 9 As to Count Two: only during one interview did J.W. allege that on a prior occasion Fortson performed oral sex on her. She said the incident happened in the backyard of B.B.'s house. The prosecution did not offer any physical evidence or any eyewitnesses to corroborate this allegation.

¶ 10 But the prosecutor did offer — without advance notice to the court or Fortson — evidence that Fortson previously committed uncharged sexual assaults against four other girls, and intimated during opening statement and closing argument that Fortson likely committed prior uncharged sexual assaults against J.W. With one exception, defense counsel did not object to what Fortson now alleges on appeal is prosecutorial misconduct.

¶ 11 Fortson testified at trial, and denied the allegations. As noted above, the jury found Fortson guilty of both charges.

## II. Prosecutorial Misconduct

### A. Standard of Review

¶ 12    In reviewing claims of prosecutorial misconduct, we engage in a two-step analysis. First, we determine whether the prosecutor's conduct was improper based on the totality of the circumstances. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010). Second, we consider whether such actions warrant reversal according to the proper standard of review. *Id.*

### B. Relevant Law

#### 1. Role and Conduct of Prosecutor

¶ 13    "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate." *People v. Robinson*, 2017 COA 128M, ¶ 13; Colo. RPC 3.8 cmt. 1. Accordingly, a prosecutor must refrain from improper methods calculated to produce a wrongful conviction. *Id.* at ¶ 14; *Harris v. People*, 888 P.2d 259, 263 (Colo. 1995).

¶ 14    In this vein, it is improper for a prosecutor to make remarks that evidence personal opinion, personal knowledge, or inflame the passions of the jury. *Domingo-Gomez v. People*, 125 P.3d 1043, 1050 (Colo. 2005). It is also improper for a prosecutor to

purposefully ask a question which he or she knows will elicit an inadmissible answer. *People v. Oliver*, 745 P.2d 222, 228 (Colo. 1987); Am. Bar Ass'n, *Fourth Edition of the Criminal Justice Standards for the Prosecution Function* 3-6.6(d) (Feb. 2015), https://perma.cc/72EP-TWAY (A "prosecutor should not bring to the attention of the trier of fact matters that the prosecutor knows to be inadmissible, whether by offering or displaying inadmissible evidence . . . .").

¶ 15 When a prosecutor purposefully exposes the jury to inadmissible and highly prejudicial evidence, such conduct will not be condoned, and a new trial may be granted. *People v. Dist. Court*, 767 P.2d 239, 241 (Colo. 1989).

### 2. Admission of Other Sexual Acts Evidence

¶ 16 In order to introduce evidence of a defendant's other sexual acts, a prosecutor must advise the court and defense counsel in advance of trial of the other acts he or she intends to introduce at trial. *See People v. Warren*, 55 P.3d 809, 812 (Colo. App. 2002); § 16-10-301(4)(a), C.R.S. 2017 ("[T]he prosecution shall advise the trial court and the defendant in advance of trial of the other act or

acts and the purpose or purposes for which the evidence is offered.").

¶ 17    The dissent takes issue with the majority's citation to this governing statute because it was not expressly cited by the parties. However, we have an obligation to resolve issues by identifying and applying the correct law.  *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991) ("When an issue or claim is properly before the court, the court . . . retains the independent power to identify and apply the proper construction of governing law.").

¶ 18    In any event, in his opening brief, Fortson expressly cited *Warren*, 55 P.3d 809, for the legal proposition that prosecutors are bound by the pretrial notice requirement.  *Warren* clarified that this notice requirement is solely a statutory requirement under section 16-10-301(4)(a) and, thus, applies only to other sexual act evidence. *Id.* at 812.

¶ 19    In addition to providing pretrial notice, a prosecutor must establish to the court, by a preponderance of the evidence, that the other act did occur and that the defendant committed the act.  *See People v. Garner*, 806 P.2d 366, 373-74 (Colo. 1991); *see also* § 16-10-301(4)(b).

¶ 20    Because evidence of a defendant's prior sexual assaults is not permissible to establish propensity, a prosecutor may not elicit other act evidence to prove a defendant's bad character and that he acted in conformity with that character. *People v. Nardine*, 2016 COA 85, ¶ 79; *see* CRE 404(b); § 16-10-301(3). Such evidence may be admissible only for other purposes, including to show motive, opportunity, intent, preparation, common plan, method of operation, knowledge, identity, or absence of mistake. CRE 404(b).

¶ 21    Thus, prior to eliciting such evidence a prosecutor must demonstrate that (1) the evidence relates to a material fact; (2) the evidence is logically relevant; (3) the logical relevance is independent of the intermediate inference that the defendant committed the crime because he or she acted in conformity with his or her bad character; and (4) the evidence's probative value is not substantially outweighed by the danger of unfair prejudice. *People v. Spoto*, 795 P.2d 1314, 1318 (Colo. 1990). "The prosecution must articulate a precise evidential hypothesis by which a material fact can be permissibly inferred from the prior act independent of the use forbidden by CRE 404(b)." *Id.* at 1319.

C.    The Conduct Was Improper

7

¶ 22    Fortson contends on appeal that the prosecutor improperly referenced and elicited evidence of other acts of sexual assault and sexual misconduct for propensity purposes, and that she did so without first seeking to admit the evidence, presenting an offer of proof, or obtaining a ruling.  We agree with Fortson that this conduct was improper.

¶ 23    The Attorney General does not dispute that the prosecutor introduced the other sexual act evidence and did so without providing notice, making any offer of proof, articulating an evidential hypothesis for admissibility, or obtaining a ruling under the four-part *Spoto* test.  She argues only that the other act evidence was not offered for an improper purpose, and thus there was no error.

¶ 24    But here, the prosecutor repeatedly brought before the jury uncharged acts of sexual assault, specifically that Fortson had previously committed other uncharged sexual assaults against other children and against J.W.  We agree with Fortson that the prosecutor's failure to follow the requisite procedures and her improper use of this evidence for propensity purposes — as discussed in detail below — constituted misconduct.

¶ 25    We are further compelled to conclude — for the reasons that follow — that the prosecutor's misconduct requires reversal of Fortson's convictions. "For, above all, it is the appellate court's responsibility to avoid a miscarriage of justice for a defendant even when defense counsel seriously lapses at trial." *Wend*, 235 P.3d at 1097.

### 1.    Uncharged Sexual Assaults Against Other Children

¶ 26    During trial, the prosecutor elicited evidence of alleged uncharged sexual assaults against four other girls: A.C., B.B., S.L., and A.B., as well as vague allegations of acts committed against "other kids."

### a.    Cross-Examination of A.K.

¶ 27    Fortson called A.K. (J.W.'s former friend) as a defense witness to testify that J.W. had told her about her motive to falsely accuse Fortson of sexual assault. A.K. testified that J.W. said she was angry because Fortson had declined her sexual advances, thus J.W. was "going to make him regret it and she was going to get her revenge."

¶ 28    The prosecutor then cross-examined A.K., first asking relevant questions that challenged the testimony about J.W.'s motive. The

9

prosecutor asked A.K. whether J.W. had, in fact, told her that Fortson put his hand up the leg of J.W.'s shorts, was rubbing around and smiling at her (rather than declining J.W.'s sexual advances). And the prosecutor asked whether J.W. had told A.K. that she did not want to get Fortson in trouble with the police because he worked for the prison (rather than trying to get revenge).

¶ 29    But then, the prosecutor started asking A.K. questions unrelated to J.W.'s allegations or motive. The prosecutor asked about statements that A.K. had made to a forensic interviewer relaying what *other girls* had told her. A.K. told the interviewer that these other girls also accused Fortson of improper sexual conduct.

> Prosecutor: Do you recall telling [the interviewer] that B.B. told you that at one time [Fortson] was changing his clothes, asked her to bring in his laptop; and when she did, she walked in the room and he -- she dropped the laptop because he was completely naked?
>
> A.K.: No, ma'am.
>
> . . . .
>
> Prosecutor: Do you recall telling [the interviewer] that another girl by the name of S.L. had told you that Mr. Fortson touched her, also?
>
> A.K.: No, ma'am.

10

Prosecutor: Do you recall telling [the interviewer] that S.L. said that Mr. Fortson put his hand on her knee and moved it up towards her private?

A.K.: No, ma'am.

. . . .

Prosecutor: Do you recall telling [the interviewer] that another girl by the name of A.B. had told you that Mr. Fortson had touched her the same way that he did with [J.W.]?

A.K.: No, ma'am.

¶ 30    At this point, the trial court interrupted the questioning and admonished the prosecutor for referring to inadmissible CRE 404(b) evidence, stating this evidence was "not allowable."

¶ 31    We agree with the trial court that the prosecutor's questions elicited inadmissible CRE 404(b) evidence.  And we conclude that such conduct was "manifestly improper."  *People v. Estep*, 196 Colo. 340, 344, 583 P.2d 927, 930 (1978); *see also Standards for the Prosecution Function* 3-6.6(d) ("The prosecutor should not bring to the attention of the trier of fact matters that the prosecutor knows to be inadmissible . . . by . . . asking legally objectionable questions.").

11

¶ 32    Even though A.K. responded that she did not remember making the statements, the prosecutor's questions themselves assumed, or asked the jury to infer, that Fortson had committed other uncharged sexual crimes.  For example, in *People v. Estep*, the prosecutor asked a witness: "You never were with [the defendant] when he was in the process of killing somebody, were you?"  196 Colo. at 344, 583 P.2d at 930.  An objection was launched before the witness could answer.  Nonetheless, the Colorado Supreme Court concluded that "[s]uch expressions by the prosecutor are a form of unsworn, unchecked testimony and tend to exploit the influence of his office and undermine the objective detachment which should separate a lawyer from the cause for which he argues."  *Id.* (quoting ABA, Standards Relating to the Prosecution Functions § 5.8(b) (Commentary)).

¶ 33    Likewise, just by asking A.K. these questions, the prosecutor essentially elicited inadmissible CRE 404(b) evidence.  *See id.*; *see also Oliver*, 745 P.2d at 228 (prosecution's conduct in asking an objectionable question was error).

¶ 34    We are not persuaded by the Attorney General's assertion that this conduct was permissible because the prosecutor was "planning

12

to impeach A.K.'s credibility by asking her these questions, eliciting denials, and then showing the jury the video of A.K.'s actual interview."

¶ 35    The prosecutor's questions about uncharged sexual crimes against other children were irrelevant to impeach A.K.'s direct examination testimony, which only addressed A.K.'s relationship with J.W. and J.W.'s desire to "get revenge" against Fortson.

¶ 36    Even if — as the Attorney General notes with record support — the prosecutor "was planning to impeach A.K.'s credibility by asking her these questions," this impeachment tactic was clearly improper.

¶ 37    The prosecutor's plan was to ask legally objectionable questions to elicit the highly prejudicial inadmissible evidence of Fortson's uncharged sexual acts (and only then, to impeach A.K.'s faulty memory about such evidence).  This, the prosecutor is not permitted to do.  *See Oliver*, 745 P.2d at 228; *see Dist. Court*, 767 P.2d at 241 ("When a prosecuting attorney purposefully exposes the jury to inadmissible and highly prejudicial evidence, his conduct will not be condoned[.]"); *see also State v. Prine*, 200 P.3d 1, 11 (Kan. 2009) (a party cannot open its own door to create an opportunity for the admission of otherwise inadmissible evidence).

13

¶ 38 The dissent does not view the prosecutor's conduct as improper. Rather, the dissent asserts that "the prosecutor was doing just as CRE 613(a) requires," *infra* ¶ 165, and suggests, therefore, that the prosecutor's contemplated impeachment was not subject to the strictures of CRE 404(b). We do not agree. CRE 613(a) simply sets forth the procedure for proper impeachment of a witness with that witness' prior inconsistent statements; it does not permit, much less address, the *permissible uses* of other act evidence.

¶ 39 The permissible uses of other act evidence is governed by CRE 404(b) (as substantive evidence), and by CRE 608 (as impeachment evidence). *See People v. Segovia*, 196 P.3d 1126, 1132 (Colo. 2008) (holding that, under CRE 608, inquiry on cross-examination into a witness' prior shoplifting was admissible to impeach that witness' testimony that she was "honest").

¶ 40 Here, the prosecutor did not use a specific instance of A.K.'s conduct to impeach her. Rather, the prosecutor asked about specific instances of *Fortson's* sexual conduct against other children, which was not a permissible use of uncharged sexual act evidence, under either CRE 404(b) or CRE 608.

¶ 41   Because the prosecutor intentionally brought inadmissible evidence of Fortson's bad character to the jury's attention by cross-examining A.K. about Fortson's alleged uncharged sexual acts, the prosecutor engaged in misconduct and disregarded her duty to refrain from improper methods calculated to produce a wrongful conviction.  *Harris*, 888 P.2d at 263; *Robinson*, ¶ 14.

            b.      Other Act Allegations in Video Recording

¶ 42   Compounding this error, the prosecutor played for the jury the very end of the video recording of J.W.'s forensic interview, where the forensic interviewer ultimately asked J.W. what she wanted to happen to Fortson.  J.W. told the interviewer that she wanted him caught because another girl, A.C., "got raped" by Fortson, that Fortson had "hurt more kids than me," that he had "raped other kids," and that B.B. told her "this was not the first time he did this."

¶ 43   For reasons that are inexplicable to us, defense counsel did not request the redaction of these statements, even though they portrayed Fortson as a sexual predator of children and risked a guilty verdict based on a conclusion that Fortson sexually assaulted J.W. in conformity with his bad character.  *See* CRE 404(b).

¶ 44    Yet even without objection, it is improper for a prosecutor to knowingly, and for the purpose of bringing inadmissible matter to the attention of the judge or jury, offer inadmissible evidence. *See People v. Mullins*, 104 P.3d 299, 301-02 (Colo. App. 2004) (finding plain error where prosecutor elicited inadmissible testimony); *see also Standards for the Prosecution Function* 3-6.6(d).

¶ 45    The dissent opines that defense counsel may have wanted the jury to hear this evidence, given his earlier request that the entire video be played. But that request must be placed in context: it was made in response to the prosecutor's rape shield motion. Defense counsel argued against the redaction of J.W.'s statement that she had been having sex with her boyfriend. Citing the "rule of completeness," *see* CRE 106, defense counsel requested the entire video be played to prevent the suppression of this exculpatory information.

### 2.    Uncharged Sexual Assaults Against J.W.

¶ 46    Not only did the prosecutor elicit the above referenced other sexual act evidence, but also, during the prosecutor's opening statement and closing argument, she expressed her belief that

16

Fortson committed other uncharged sexual assaults against J.W. This, too, was improper.

### a. Opening Statements

¶ 47     During her opening statement, the prosecutor told the jury, "I can't tell you that [the two charged instances of sexual assault] are the only incidents that occurred of Fortson sexually assaulting [J.W.], but I can tell you that these are the two clearest incidences that she, thus far, has been willing to talk about." This remark to the jury was impermissible.

¶ 48     A prosecutor must not "intimate that she has personal knowledge of evidence unknown to the jury." *Domingo-Gomez*, 125 P.3d at 1049. The prosecutor's statements implied that she knew of other instances in which Fortson had sexually assaulted J.W., but that J.W. could not, or would not, be telling the jury about them. Such remarks conveyed that the prosecutor had additional incriminating evidence unknown to the jury. *See id.* at 1052.

¶ 49     The prosecutor's remark is a "matter of special concern" because there is a "possibility that the jury will give greater weight to the prosecutor's arguments because of the prestige associated

with the office and the presumed fact-finding capabilities available to the office." *Id.* at 1049.

¶ 50     Further, a prosecutor may not, in an opening statement, "induce the jury to determine guilt on the basis of passion or prejudice." *People v. Manyik*, 2016 COA 42, ¶ 27 (quoting *People v. Douglas*, 2012 COA 57, ¶ 66). Nor may she appeal to the jurors for sympathy for the victim. *Id.* at ¶ 29.

¶ 51     Yet here, the prosecutor improperly suggested to the jury that Fortson had sexually assaulted J.W. not only on the two occasions charged, but also on other occasions. This implied that Fortson was a serial sexual abuser, and also that J.W. was victimized by additional instances of sexual abuse, thereby prejudicing the jurors against Fortson and appealing to their sympathies for J.W. *Id.*; *see also Domingo-Gomez*, 125 P.3d at 1052-53 (A prosecutor's comments which express the prosecution's personal opinion or personal knowledge or remarks that inflame the passions of the jury "can tip the scales towards an unjust conviction and must be avoided.").

¶ 52     The dissent suggests that the prosecutor's opening statement may have been referring to J.W.'s forensic interview, during which

J.W. referenced what the dissent refers to as other "misconduct." But in that interview, other than describing the charged incident, J.W. said only that Fortson had previously touched her *legs*. As the forensic interviewer confirmed in her trial testimony, the charged incident of sexual intercourse was the only disclosure of sexual assault J.W. made in that interview.

### b. Closing Argument

¶ 53 During closing argument, the prosecutor argued repeatedly that the jury could consider, as evidence of Fortson's guilt, uncharged prior sexual assaults.

¶ 54 The prosecutor argued to the jury:

> And I would also tell you, it doesn't make any
> sense at all that that incident in the backyard
> [involving oral sex] was the first incident. The
> first incident of sexual abuse is not going to be
> Lee Fortson taking her out in the backyard
> and licking her vagina, it's just not. There's
> going to be other incidents –

¶ 55 At this point, defense counsel objected, on the basis that the prosecutor was "saying that there are other incidents other than those charged." The court responded, "All right. You did say that earlier, [prosecutor], and the jury needs to be very clear." It then instructed the jury:

Count number 1, the sexual assault on a child, pattern of abuse, relates only to two incidents: the alleged licking of the vagina and the alleged sexual assault in [B.B.'s] home. You all have to be unanimous in each of those incidents before you could find Mr. Fortson guilty of that particular charge. There are no other incidents of [im]proper sexual contact alleged. You heard no evidence of other, other incidents of [im]proper sexual contact. And sexual contact is defined in the instructions that I just read to you. So [prosecutor], we've talked about not having unanimity instructions. You need to be very careful in your comments in this area.

¶ 56 The prosecutor resumed her argument by asking the jury to determine the pattern count based on the two charged incidents. But then, undaunted by the court's admonishment, she quickly returned to the topic of Fortson's other, uncharged acts of sexual assault:

It's those two incidents [of sexual intercourse and oral sex] are what I'm asking you to look at. But, you saw when [the forensic interviewer/expert] testified. She said that these disclosures could be consistent with other incidents that have been come –

¶ 57 Defense counsel immediately interrupted, stating, "Your Honor, I'm objecting. And as a matter of fact, I have a motion." At

this point, the court held a discussion with the attorneys that is not reported in the record on appeal.

¶ 58     To be sure, "[p]rosecutors are granted wide latitude during closing arguments." *People v. Whitman*, 205 P.3d 371, 384 (Colo. App. 2007). But a "[c]losing argument must be confined to the evidence admitted at trial, the inferences that can reasonably and fairly be drawn from it, and the instructions of law submitted to the jury." *People v. Rojas*, 181 P.3d 1216, 1223 (Colo. App. 2008); *People v. Walters*, 148 P.3d 331, 334 (Colo. App. 2006) ("[I]t is not proper for a prosecutor to refer to facts not in evidence or to make statements reflecting his or her personal opinion or personal knowledge.").

¶ 59     The prosecutor cannot use closing argument to "mislead or unduly influence the jury." *Whitman*, 205 P.3d at 384. To that end, improper arguments include those that are calculated to inflame the passions and prejudices of the jury; tend to influence jurors to decide the case based on pre-existing biases, rather than the facts; misstate the evidence; and imply personal knowledge of evidence unknown to the jury. *Id.*; *see also People v. Gladney*, 250 P.3d 762, 769 (Colo. App. 2010). Claims of improper argument

must be evaluated in the context of the argument as a whole and in light of the evidence before the jury. *People v. Krutsinger*, 121 P.3d 318, 324 (Colo. App. 2005).

¶ 60    We conclude that the prosecutor's remarks were improper. They removed the focus from the evidence presented in the case, and reveal an effort by the prosecutor to evoke bias and influence the jury to decide the case based on an improper basis. *See Harris*, 888 P.2d at 265. The prosecutor's intimations about these uncharged sexual assaults against J.W. encouraged the jury to misuse this "information" as evidence of Fortson's bad character, and to create sympathy for J.W. *See Whitman*, 205 P.3d at 384 (In a prosecution for sexual assault on a child, the prosecutor's reference during closing argument to an unrelated child murder case in Florida was improper because it "invited the jurors to make a comparison to an irrelevant and prejudicial case.").

¶ 61    Finally, we note that the prosecutor repeated her remarks intimating that Fortson engaged in other sexual acts against J.W. even after defense counsel's objections and the trial court's warning to her to "be very careful in your comments in this area." Given the prosecutor's obvious knowledge that this evidence had not been

admitted for any purpose — in light of the trial court's admonishment and defense counsel's objections — her conduct was clearly improper. *See People v. McBride*, 228 P.3d 216, 223 (Colo. App. 2009); *see also Oliver*, 745 P.2d at 228 ("A prosecutor must promptly comply with all orders and directives of the court, I Standards for Criminal Justice, The Prosecution Function, section 3-5.2(d) (1986 Supp.).").

¶ 62    We are unpersuaded by the Attorney General's assertion that the prosecutor's closing argument was a proper comment on evidence of "grooming." To be sure, the forensic interviewer testified about "grooming" behavior. But the prosecutor's closing argument went far beyond discussing evidence of grooming to allege prior incidents of sexual assault.

¶ 63    The concept of grooming relates to a sex offender's "methods of acquiring victims" to lower their inhibitions. *Romero v. People*, 2017 CO 37, ¶ 15. It refers to conduct, such as gift giving, affectionate touching, or even watching pornography or other sexualized play. *People v. Relaford*, 2016 COA 99, ¶ 21; *People v. Miranda*, 2014 COA 102, ¶ 53. It precedes the later criminal sexual act and involves "a pattern of seduction and preparation, resulting in the

child being willing and compliant to the defendant's sexual abuse." *Miranda*, ¶ 53 (citation omitted); *see People v. Garrison*, 2017 COA 107, ¶ 40 n.5.

¶ 64 But here, the prosecutor's intimations of other uncharged *sexual assaults* were not comments on grooming behavior. Her argument improperly encouraged the jury to find Fortson guilty by suggesting he sexually abused J.W. in the past and acted in conformity with this prior abuse on the two charged occasions.

### D. The Misconduct Warrants Reversal

¶ 65 Having determined that the prosecutor engaged in misconduct by repeatedly referencing uncharged sexual assaults by Fortson against J.W. and at least four other children, we now conclude that it requires reversal.

### 1. Preserved Error

¶ 66 Fortson's counsel objected during the prosecutor's statement during closing argument that it does not make sense that the charged incidents were the "first incident[s] of sexual abuse." Prosecutorial misconduct to which defense counsel objects is reviewed for nonconstitutional harmless error. Under this standard, improper argument is harmless if it did not "substantially

24

influence the verdict or adversely affect the fairness of the proceedings." *Douglas*, ¶ 58 (quoting *Whitman*, 205 P.3d at 384-85).

¶ 67     As discussed above, the prosecutor's argument significantly risked a guilty verdict based on considerations other than the evidence of the charged acts presented at trial. *See People v. Wilson*, 743 P.2d 415, 419 (Colo. 1987). Ordinarily, of course, the sustaining of an objection or a trial court's instruction to a jury to disregard inadmissible evidence sufficiently remedies the offending argument or conduct. But not always. The supreme court has recognized that when evidence "is so highly prejudicial, as here, it is conceivable that but for its exposure, the jury may not have found the defendant guilty." *People v. Goldsberry*, 181 Colo. 406, 410, 509 P.2d 801, 803 (1973).

¶ 68     The prosecutor's statements fall squarely within this class of highly prejudicial evidence that might not be easily cured by a limiting instruction. To be sure, the trial court, in response to this argument, instructed the jury that the charges related only to two incidents. But without more, and given the exceptional prejudice associated with the pervasive misconduct throughout trial, we

25

conclude that admonition was insufficient to remedy the prejudice.[2]
*See Wilson*, 743 P.2d at 420–21 ("It would defy common sense, however, to believe that [the credibility] instruction was sufficient to neutralize the impact of the prosecutor's improper remarks during summation. . . . [J]urors do pay heed to the arguments of counsel in arriving at a result.").

¶ 69    When a person is on trial for alleged sexual assaults on a child, information suggesting that the defendant escaped criminal charges for a previous sexual assault of that child is exceptionally prejudicial.  We now consider the resulting prejudice of this argument along with the other instances of misconduct.

## 2.    Unpreserved Error

¶ 70    Fortson did not object to any of the other damaging evidence of prior uncharged sexual assaults, and so this misconduct must be reviewed for plain error.

¶ 71    Before we engage in this analysis, we first address a key dispute between the majority and the dissent as to the focus of the plain error standard of review.

---

[2] Although the court also stated, "You heard no evidence of . . . other incidents of [im]proper sexual contact," the jury did hear testimony that Fortson "raped" other children.

¶ 72    The dissent imposes a "fairness to the trial court" standard instead of independently addressing the elements of the plain error analysis: obviousness and fundamental fairness of the trial. *See Nardine,* ¶ 63 (to warrant reversal under the plain error standard, the misconduct must be obvious and substantial and so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction).

¶ 73    We disagree with the dissent's repeated statements that in conducting plain error review, fairness to the trial court, rather than the guarantee of a fair trial for the defendant, is the touchstone. While appellate courts certainly should strive to be fair to all participants in the criminal justice process, placing "fairness to the trial court" on the same pedestal with a defendant's constitutionally guaranteed right to a fair trial is unsupported by any legal authority of which we are aware.

¶ 74    Likewise, we disagree with the standard employed by the dissent that evaluates whether "the trial court deserves better." In this regard, the dissent posits that when an appellate court finds plain error, then "by implication [it is] impugning the trial judge's competence." *Infra,* ¶ 180. The dissent attributes to the majority

an outdated premise from *People v. Taylor*: "a *competent* trial judge should be able to avoid [the error] without benefit of objection." 159 P.3d 730, 738 (Colo. App. 2006) (emphasis added) (addressing the obviousness prong of plain error analysis).

¶ 75 The majority does not follow this premise. Indeed, in recent years, the "competent trial judge" language has not been used by this court. It also has been rejected by the United States Supreme Court in *Henderson v. United States*, 568 U.S. 266 (2013). There, the Supreme Court expressly recognized that "plain-error review is not a grading system for trial judges"; it serves other "broader purposes," including "fairness and judicial integrity." *Id.* at 278.

¶ 76 With that clarification, we now determine whether any error is reversible under the plain error standard.

¶ 77 To warrant reversal under plain error review, prosecutorial misconduct "must be obvious and substantial and so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction." *Nardine*, ¶ 63.

¶ 78 Obvious error is that which contravenes "(1) a clear statutory command; (2) a well-settled legal principle; or (3) Colorado case law." *Scott v. People*, 2017 CO 16, ¶ 16 (citation omitted). Here, as

discussed in detail above, the prosecutor contravened well-settled law that prohibits the admission of prior sexual acts as propensity evidence by repeatedly eliciting and referencing such evidence. *See* § 16-10-301; CRE 404(b); *Garner,* 806 P.2d at 373-74; *Spoto,* 795 P.2d at 1319.

¶ 79     We therefore must determine whether this obvious error affected the fundamental fairness of the trial.

¶ 80     A reviewing appellate court must "inquire into whether the errors seriously affected the fairness or integrity of the trial." *Domingo-Gomez,* 125 P.3d at 1053; *see also Hagos v. People*, 2012 CO 63, ¶ 14. For, above all, it is the appellate court's responsibility to avoid a miscarriage of justice for a defendant even when defense counsel fails to object to serious errors at trial. *Wend,* 235 P.3d at 1097-98. Indeed, fundamental fairness is the "beacon of plain error review." *Nardine,* ¶ 64.

¶ 81     In this inquiry, we must consider the particular facts and context because only through examining the totality of the circumstances can we determine whether the error affected the fundamental fairness of the trial. *Id.* at ¶ 65. We evaluate the cumulative effect of the prosecutor's statements by considering the

29

exact language used, the nature of the misconduct, the degree of prejudice associated with the misconduct, the surrounding context, and the strength of the other evidence of guilt. *Wend*, 235 P.3d at 1098.

¶ 82 Repeated references to inadmissible prior bad act evidence, as occurred here, are especially problematic in a prosecution for sex crimes against a child victim. The emotional responses that attend such charges are inevitably heightened and a prosecutor must be vigilant not to step over the line. *See Wilson*, 743 P.2d at 419 (cautioning prosecutors in cases of sexual assault on children to ensure "that the jury tries the case solely on the basis of the *facts* presented to them" (quoting *People v. Elliston*, 181 Colo. 118, 126, 508 P.2d 379, 383 (1973))).

¶ 83 The pervasive nature of the misconduct in this case is particularly concerning. The uncharged sexual acts were a recurring theme throughout the trial. And more, the prosecutor persisted in referring to these uncharged acts despite the trial court's sua sponte admonishment and defense counsel's objections during closing. *See Walters*, 148 P.3d at 338 (noting that plain error review requires a consideration of any persistent, improper

remarks by the prosecutor); *cf. Domingo-Gomez*, 125 P.3d at 1053 ("Comments that were 'few in number, momentary in length, and were a very small part of a rather prosaic summation' do not warrant reversal under the plain error standard." (quoting *People v. Mason*, 643 P.2d 745, 753 (Colo. 1982))).

¶ 84    We cannot ignore the high degree of prejudice associated with the misconduct.  These references were not only to the type of offense that inherently carries an emotional charge, but the prosecutor referenced prior allegations of sexual abuse against not only the victim in this case but also at least four other children.  A.K.'s allegations, drawn out during the prosecutor's cross-examination, referenced incidents involving three other girls.  Similarly, J.W.'s statements referenced uncharged assaults against other children.  She mentioned one girl by name, but also implied there may be many "other kids" Fortson had "raped" or harmed.  This evidence implied that Fortson was a sexual predator of children, and implied that, for that reason, Fortson must also be guilty of the charged acts.

¶ 85    We also consider the surrounding context of the trial as a whole.  This case largely turned on the credibility of the victim and

31

the defendant, as the experts sharply disputed the significance of the DNA evidence. J.W.'s allegations were denied by Fortson, who testified in his own defense, and several witnesses questioned J.W.'s credibility. Thus, the jury's assessment of J.W.'s and Fortson's credibility was essential to his conviction, and the misconduct had the effect of denigrating Fortson and making it appear likely that Fortson either had repeatedly committed acts similar to those charged or was incredible. *Nardine*, ¶ 68 (Misconduct was prejudicial in a case that "depended almost entirely on the jurors' assessment of [the victim's] credibility.").

¶ 86    Finally, we consider the strength of the other evidence. As to Count Two, the oral sex incident, the prosecutor did not present any corroborating evidence outside of J.W.'s allegation.

¶ 87    As to Count One, the sexual intercourse incident, the prosecutor did present DNA evidence to corroborate J.W.'s allegation. But while it may have been the strongest evidence corroborating this allegation, it was of disputed quality.

¶ 88    The prosecution's expert testified that false positives "are known" to occur in initial screening tests, and his initial screening indicated it was "likely," but could not confirm, that semen was

32

present on the inside of J.W.'s underwear. The defense DNA expert disagreed with the conclusion that there was semen in the victim's underwear. He opined that the DNA might have resulted from a secondary transfer, the quality of the DNA sample was poor, and that because no male DNA was in the vaginal swab taken from J.W., there was no forensic evidence that Fortson had sexual intercourse with her.

¶ 89    True, the prosecutor's expert testified that with further testing, he excluded 98.6% of the "Caucasian population," but not Fortson, as the source of the sample. But the defense expert emphasized that this result would have, conversely, matched 1.4% of Caucasian males in the United States, a significantly large number.

¶ 90    The resolution of the disputed evidence was, of course, for the jury, not us. Yet, this evidence was not sufficient in both quantity and quality to enable us to conclude that the jury "could not have arrived at a verdict other than guilty." *See People v. Rodriguez*, 914 P.2d 230, 278–79 (Colo. 1996) (quoting *People v. Rodgers*, 756 P.2d 980, 985 (Colo. 1988)).

¶ 91    Considering the prosecutor's pervasive misconduct in the context of the entire record, we are convinced that it undermined

the fundamental fairness of the trial and, in our view, "cast serious doubt on the reliability of the judgment of conviction." *Weinreich*, 98 P.3d at 924.

¶ 92 As the dissent notes, reversals for plain error are rare. But this does not excuse an appellate court from determining, as we do here, that the defendant did not receive a fair trial because of prosecutorial misconduct. Appellate courts have the responsibility to determine when plain error prevents a defendant from receiving a fair trial, and this is such a case.

¶ 93 Accordingly, Fortson's judgments of conviction are reversed.

### III.   Trial Court Error Regarding Other Act Evidence

¶ 94 Fortson also contends that the trial court erred when it allowed the prosecutor to present and elicit the uncharged sexual assault evidence and when it failed to instruct the jury to disregard it. Fortson argues that the trial court committed plain error when it allowed the prosecutor to present this evidence because the video contained inadmissible CRE 404(b) evidence.

¶ 95 However, given our conclusion that the introduction and use of this evidence constituted reversible prosecutorial misconduct, we

need not address whether the trial court also erred in allowing or failing to instruct the jury on this evidence.

## IV. Expert Witness Testimony — Alleged Bolstering

¶ 96 To provide guidance on retrial, we briefly address Fortson's argument on appeal that the child abuse expert improperly bolstered the victim's credibility because she testified both as a fact witness regarding her forensic interview of the victim and as an expert witness on child sex abuse victims.

¶ 97 Fortson does not cite, and we cannot find, any decision of either the Colorado Supreme Court or this court that has categorically proscribed such dual capacity testimony. The supreme court has concluded that such testimony is impermissible in certain circumstances not present here.

¶ 98 In *Salcedo v. People,* a detective testified both as an expert witness "concerning the behavior and characteristics that constitute the drug courier profile" and as an eyewitness "concerning [the defendant's] actions and appearance" at the time of his arrest. 999 P.2d 833, 840 (Colo. 2000). The supreme court was primarily concerned with whether the detective's testimony about the drug courier profile was unduly prejudicial. *Id.* The court did not hold

that the detective's testimony was categorically proscribed because he testified as both an expert witness and as an eyewitness. *Id.* Instead, the court concluded that the detective's testimony was impermissible because it intermingled expert witness testimony concerning the behavior and characteristics that constituted the drug courier profile with eyewitness testimony concerning the defendant's actions and appearance. *Id.*

¶ 99 While such dual capacity testimony is problematic for several reasons identified in *Salcedo* and the reasons identified in Judge Berger's special concurrence, in the absence of binding appellate authority condemning such testimony, it remains for the trial court to exercise its discretion to control and, in appropriate circumstances, preclude such testimony on proper objection.

V. Rape Shield Statute Arguments Were Not Preserved For Appeal

¶ 100 Fortson also contends on appeal that the trial court erred in excluding evidence of the victim's alleged sexual activity with her boyfriend under the rape shield statute because the evidence was relevant both to show an alternate source for the victim's sexual knowledge and to show an alternate source of the DNA found in her underwear.

¶ 101    We do not address this contention other than to observe that Fortson did not make these arguments at trial or, when required by the rape shield statute, follow the statute's procedural requirements.  Instead, he made two other arguments under the rape shield statute.  First, he argued that the court should allow the admission of evidence that the victim had multiple sets of DNA on the waistband of her underwear.  Second, he argued that evidence of the victim having sex with her boyfriend was relevant to explain why she went to the pregnancy center.  The trial court correctly resolved these arguments.

## VI.    Conclusion

¶ 102    Fortson's convictions are reversed, and the case is remanded for a new trial.

JUDGE BERGER specially concurs.

JUDGE WEBB dissents.

JUDGE BERGER, specially concurring.

¶ 103    I join Judge Lichtenstein's opinion reversing Fortson's convictions on the basis of prosecutorial misconduct. I fully agree that the prosecutor engaged in serious misconduct. It is a much closer question, for all the reasons articulated by Judge Webb, whether that misconduct by itself requires reversal. Regardless, in my view, when the prosecutorial misconduct is considered in conjunction with the improper use of expert testimony, the conclusion that Fortson did not receive a fair trial is manifest.

¶ 104    The prosecution of sex offenses against children unavoidably places enormous pressures on all participants in the judicial process: victims, defendants, prosecutors, jurors, and judges. Because of the nature of these crimes, there often is no forensic, scientific, or corroborating evidence. In many of these cases, whether the defendant spends the remainder of his or her life in prison turns solely on the jury's determination of whether the victim or the defendant is telling the truth.

¶ 105    Because the actions and reactions of sexual assault victims, particularly children, can appear perplexing and even counterintuitive to the ordinary juror, courts uniformly permit the

prosecution to present expert testimony from child sex assault experts regarding general characteristics of sex assault victims — to explain why some victims delay reporting (or do not report at all) and similar matters. *See, e.g., Venalonzo v. People*, 2017 CO 9, ¶¶ 32-34; *People v. Wittrein*, 221 P.3d 1076, 1081 (Colo. 2009); *People v. Relaford*, 2016 COA 99, ¶¶ 26-30.

¶ 106    But courts also recognize that this type of testimony (indeed most, if not all, expert testimony) at least collaterally bolsters the credibility of a witness, often the victim, and thus implicates the principle that no witness, including an expert witness, may testify that another witness has told the truth on a particular occasion. *See Relaford*, ¶ 30. "Testimony that another witness is credible is especially problematic where the outcome of the case turns on that witness' credibility. This often occurs in child sex assault cases." *Venalonzo*, ¶ 33.

¶ 107    When there is no unusual conduct by the victim outside the ken of the ordinary juror, the bolstering effect is unacceptable and expert testimony of this type (even by a qualified witness) should be excluded under CRE 702 because it is not useful to the jury, or

under CRE 403 because the probative value is outweighed by the prejudicial effect, or both.

¶ 108    If the victim acts in a manner that an ordinary juror might consider to be unusual or inconsistent, and if an expert testifies that such acts are common among typical sexual assault victims, the expert's testimony both explains the victim's unusual or inconsistent actions and makes it more likely that the victim's testimony regarding the alleged assault is accurate and truthful. *See, e.g., People v. Morrison*, 985 P.2d 1, 5-6 (Colo. App. 1999), *aff'd*, 19 P.3d 668 (Colo. 2000).

¶ 109    When the expert testimony is limited to general characteristics of child sex assault victims, the collateral bolstering of the victim's credibility is tolerable because otherwise a jury may be unable to accurately address odd or peculiar behavior by victims and conclude, incorrectly, that such behavior necessarily means that the victim has not told the truth.  *See Venalonzo*, ¶¶ 32-33; *People v. Fasy*, 829 P.2d 1314, 1316 (Colo. 1992).

¶ 110    The supreme court has prohibited not only direct testimony that another witness has told the truth on a particular occasion, but also indirect or disguised testimony that accomplishes the same

improper objective. Thus, in *People v. Wittrein,* the court held that testimony by a child psychiatrist that she found it "hard . . . to imagine that an eight-year-old child would be able to put together . . . a plan" to portray herself as a victim constituted improper opinion testimony by the psychiatrist that the victim was telling the truth about the alleged assault.[1] 221 P.3d at 1081-82. In *People v. Snook,* the court held that it was impermissible for a social worker to testify that children tend not to fabricate stories of sexual abuse. 745 P.2d 647, 649 (Colo. 1987). Similarly in *People v. Eppens,* the court held that a social worker impermissibly testified that the child victim's report of a sexual assault was "sincere." 979 P.2d 14, 17-19 (Colo. 1999). And, in *People v. Gaffney,* the court held that an expert could not testify that the child victim was "very believable." 769 P.2d 1081, 1088 (Colo. 1989).

¶ 111    Most recently, in *Venalonzo,* ¶ 35, the supreme court held that an expert's testimony "improperly bolstered the children's credibility

---

[1] The court nevertheless held that the testimony was properly admitted because it was invited by defense counsel's cross-examination of the psychiatrist. *People v. Wittrein,* 221 P.3d 1076, 1082 (Colo. 2009).

and led to the impermissible inference that the children were telling the truth about the incident" when the expert testified that "many of the children's behaviors were common to other child sex assault victims she had interviewed and testified that some forensic interviews have led the People to drop charges against suspects."[2]

¶ 112  While *Venalonzo* may, and probably should, be read as restricting the admissibility of some expert testimony previously permitted by Colorado case law, I do not read it as a blanket prohibition of expert testimony regarding the general characteristics of sexual assault victims, so long as the expert does not opine, directly or indirectly, that the victim actually fits the general characteristics testified to by the expert.

¶ 113  In *People v. Koon*, 724 P.2d 1367, 1370 (Colo. App. 1986), a division of this court held that a social worker's testimony which "merely stated that the stepdaughter's observed behavior was consistent with the unique child incest patterns described by the police psychologist" was properly admitted. Similar evidence was

---

[2] In his opinion in *Venalonzo v. People*, Justice Coats wrote: "I understand the majority to hold that CRE 608(a) prohibits a witness from implying, *either directly or indirectly*, that someone else is telling the truth on a particular occasion . . . ." 2017 CO 9, ¶ 65 (Coats, J., concurring in the judgment) (emphasis added).

approved by the division in *People v. Cernazanu*: "[E]xperts may testify concerning whether a victim's behavior or demeanor is consistent with the typical behavior of victims of abuse." 2015 COA 122, ¶ 13 (quoting *People v. Glasser*, 293 P.3d 68, 78 (Colo. App. 2011)).

¶ 114   I find it difficult to reconcile these portions of *Koon* and *Cernazanu* with *Venalonzo* because once the expert assumes the role of not only educating the jury on general victim characteristics but also opines that the particular victim's conduct is in conformity with those characteristics, the expert probably crosses the line. However, I do not read *Venalonzo* as prohibiting either evidence of general victim characteristics or the jury from determining whether the victim, in fact, meets the general characteristics.

¶ 115   This court has also addressed the boundaries between permissible victim characteristic evidence and impermissible direct or indirect testimony regarding the truthfulness of the victim. For example, in *Cernazanu*, ¶ 16, the division held that "[t]estifying that [the victim] did not engage in her typical 'lying' behavior on that occasion (specifically, not promptly recanting) necessarily implied

[the mother's] opinion that [the victim] was not lying and, thus, that she was telling the truth on that occasion."

¶ 116  To avoid having experts express, directly or indirectly, opinions that the victim told the truth regarding the alleged assault, prosecutors sometimes use "cold" or "blind" experts to educate the jury regarding common characteristics of child sex assault victims.[3] A "cold" or "blind" expert knows little or nothing about the facts of the particular case, often has not even met the victim, and has not performed any forensic or psychological examination of the victim. *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendment; Christopher Tarver Robertson, *Blind Expertise*, 85 N.Y.U. L. Rev. 174 (2010).

¶ 117  The drawing of precise lines in this area is extremely difficult because of the recognition that this type of evidence is admissible in certain cases, but may be in tension with the principle that no

---

[3] I recognize that depending on how the "blind" expert's testimony is presented and crafted, the expert's testimony may still constitute an impermissible indirect opinion that a witness told the truth on a particular occasion.  *See People v. Snook*, 745 P.2d 647, 648-49 (Colo. 1987) (holding that, even though "the expert had no personal knowledge of the victim's credibility and couched her testimony in general terms," her testimony was still improper because it referred to the victim's character for truthfulness).

witness may testify that another has told the truth. This tension necessarily imposes an enhanced obligation on trial judges to vigorously enforce the requirements of both CRE 702 and CRE 403.

¶ 118 When there is no unusual conduct by the victim outside the ken of the ordinary juror, the bolstering effect is unacceptable and expert testimony of this type (even by a qualified witness) should be excluded under CRE 702 because it is not useful to the jury, or under CRE 403 because the probative value is outweighed by the prejudicial effect, or both.

¶ 119 This case presents a particularly problematic and, in my view, improper, use of expert testimony in a child sex assault case. Thus, while I join Judge Lichtenstein's opinion reversing Fortson's convictions based on prosecutorial misconduct, I write separately to explain why, irrespective of prosecutorial misconduct, the admission of prejudicial testimony by the child sex assault expert requires reversal.[4]

---

[4] Because a majority of the division has not reversed based on the expert's testimony, I address only summarily the questions of preservation and the Attorney General's assertion of invited error. I would hold that the error was not preserved and that plain error review applies. As to invited error, I believe the Attorney General's contention borders on frivolity. I reject the argument that by

¶ 120    The child sex assault expert in this case did not testify as a "cold" or "blind" expert and did not limit her testimony to general characteristics or reactions of child sex assault victims.  She did exactly the opposite.  She testified in three different capacities: (1) as an expert in performing forensic interviews of child sex assault victims; (2) as a child sex assault expert on the general characteristics of child sex assault victims; and (3) as a lay witness regarding the forensic interview she conducted of the victim.[5]

¶ 121    The hazards of dual capacity expert testimony, where a witness testifies as both an expert and lay witness, are well known. In a different context, involving drug courier profiling, the Colorado Supreme Court explained the pitfalls that may result from the conflation of a witnesses' two separate roles.

---

making proper relevance objections (objections which were sustained) and attempting to cabin the expert's testimony to matters that had some relation to the case at hand, the defense invited the prosecutor to offer prejudicial opinions that told the jury that the victim testified truthfully.

[5] Most of the expert's testimony regarding her forensic interview of the victim does not appear to be expert testimony at all, but lay testimony, either as a percipient witness or under CRE 701. *Venalonzo*, ¶¶ 27-30.  The risks of this testimony, described in the text, do not depend on whether that portion of her testimony was expert or lay testimony.

In this case, [the drug courier profile expert] testified as both a factual witness and an expert witness. During his direct examination, [the expert] intermingled expert testimony concerning the behavior and characteristics that constitute the drug courier profile with eyewitness testimony concerning Salcedo's actions and appearance. Consequently, [the expert's] testimony posed a risk of misleading the jury to believe that Salcedo exhibited all of the behaviors and characteristics in [the expert's] profile or that all of Salcedo's behaviors and characteristics could be found in [the expert's] profile. [The expert's] testimony also posed an undue risk of misleading the jury because the jury reasonably could have believed it was reliable and logically relevant to Salcedo's guilt.

*Salcedo v. People*, 999 P.2d 833, 840 (Colo. 2000). The supreme court did not, however, establish a per se rule prohibiting such dual capacity testimony.[6] *Id.*

---

[6] There is a substantial body of federal case law regarding dual purpose expert testimony, primarily arising from prosecutions for drug offenses. *See* Robert E. Larson, *Navigating the Federal Trial* § 2:28, Westlaw (database updated June 2017) (collecting cases). These cases primarily address the pitfalls of dual capacity testimony for reasons apart from commenting on the truthfulness of a victim or witness. *See, e.g., United States v. Haines*, 803 F.3d 713, 730-32 (5th Cir. 2015); *United States v. Garcia*, 752 F.3d 382, 392 (4th Cir. 2014); *United States v. Baptiste*, 596 F.3d 214, 224 (4th Cir. 2010); *United States v. Dukagjini*, 326 F.3d 45, 58-59 (2d Cir. 2003).

¶ 122    When, as here, the principal defense is that the crime did not occur, the risks of dual capacity testimony are obvious and substantial. Nevertheless, the prosecutor chose to play roulette and called a dual capacity expert. Recognizing these risks, and consistent with *Salcedo*'s guidance, the trial court attempted to guide and limit the prosecutor's examination of the expert to avoid precisely the problem that now confronts us. The court explained to both the prosecutor and the expert, in no uncertain terms, what testimony would be permitted and what would be prohibited, but, in important respects, they ignored these instructions.[7]

¶ 123    The first significant breach of the trial court's limitations on the expert's testimony occurred when the prosecutor induced the expert to give testimony regarding the "perfect victim." The expert opined that perpetrators often seek victims who have developmental and credibility issues, and are thus less likely to be believed, which provides "cover" for the perpetrator.

---

[7] Like the supreme court in *Salcedo v. People*, I would not adopt a per se rule prohibiting dual capacity testimony, but also like the supreme court in *Salcedo*, I emphasize the grave risks to a fair trial often inherent in such testimony. 999 P.2d 833, 840 (Colo. 2000).

¶ 124    While the expert did not specifically identify the victim in this case as "the perfect victim," I am convinced that not a single person in the courtroom, including the jurors, failed to make the connection.  Not surprisingly, the victim had all of the characteristics that the expert testified made a child a perfect victim.

¶ 125    Even worse, when explaining the obstacles victims face in disclosing sexual assaults, the expert used the "example" of a "child that's potentially, say, fourteen.  And, potentially, they are emotionally ten — something like that. . . ."  Of course, by that time, the jury had heard the victim's mother testify that the victim was a fourteen-year-old girl who acted as if she were ten.  There was nothing "potential" about it and the probability that the expert coincidentally chose those ages to illustrate her testimony is infinitesimal.  Everyone understood that the expert was talking about the victim.

¶ 126    It does not end there.

¶ 127    During one of her interviews (but not others), the victim recounted that during the assault she poked Fortson in the eye. The alleged eye-poking incident had no intrinsic significance.  In

terms of the elements of the charged offenses, it mattered not one whit if the victim poked Fortson in the eye.

¶ 128 A defendant, of course, has the right to test the credibility of a witness, particularly a witness who inculpates a defendant in some of the most serious crimes in the criminal code. *People v. Segovia*, 196 P.3d 1126, 1130 (Colo. 2008). Defendants often and legitimately argue that because a witness was untruthful in some respects, her testimony should not be believed in other respects. *See* COLJI–Crim. E:05 (2016) (stating that a juror "may believe all of the testimony of a witness, part of it, or none of it"). The eye-poking incident was one such inconsistency, which Fortson highlighted on cross-examination of the expert.

¶ 129 Not surprisingly, the prosecutor sought to minimize the effects on the victim's credibility of the apparently fanciful eye-poking incident. The prosecutor again invited the expert to conflate her different roles: as a child sex abuse expert who could provide useful information about the general characteristics of sexual assault victims, and as the person who actually conducted the victim's forensic interview and knew much about the victim. The prosecutor prompted the expert to testify that it was not unusual for a sexual

assault victim to incorrectly, or falsely, recall defending herself

during an assault (such as poking the assailant in the eye) and,

implicitly, that such false recall has no effect on the overall

credibility of the outcry.

> Prosecutor: I asked you about poking in the eye that [defense counsel] had asked you about. Have you ever heard of cases or been involved in cases where children made something up about hitting an assailant or a Perpetrator over the head — somehow assaulting a, a Perpetrator?
>
> Expert: Yes; as I previously described, it's a coping mechanism that children utilize. We do refer to it as empowerment; basically, an adult perceiving a child being assaulted.
>
> An adult's perception is [indiscernible] adult's perception is that they should fight back in some way. And children know that or at least perceive that that's what the adult is going to expect of them.
>
> So, many times they'll add on something to the effect of, you know, they hit their Perpetrator *or they poked him in the eye* or they, you know, stabbed them with a knife and ran away; those sorts of things.

(Emphasis added.)

¶ 130    There was not even a pretense that this testimony related to

anything other than whether the victim told the truth about the

51

alleged sexual assault despite her prevarication about the eye-poking incident.

¶ 131    As I see it, the error in the admission of this testimony was obvious both because it violated the court's prior order limiting the expert's testimony and because it violated the principle that no witness may ever testify that another witness has told the truth on a particular occasion.[8]  *Venalonzo*, ¶ 32.

¶ 132    I also conclude that the second component of plain error was met here: that the error in the testimony was so substantial it "undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction." *People v. Miller*, 113 P.3d 743, 750 (Colo. 2005) (quoting *People v. Sepulveda*, 65 P.3d 1002, 1006 (Colo. 2003)).

¶ 133    In concluding that the erroneous admission of the expert's testimony regarding the credibility of the victim was plain error, I do not disregard the force of the DNA evidence against Fortson.

---

[8] I do not address whether expert testimony by a "blind" expert regarding a child sex assault victim's propensity to exaggerate her alleged defensive actions would always be improper.  Here, however, the testimony was presented to directly rehabilitate the credibility of this particular victim and not by a "blind" expert.

¶ 134    The DNA evidence, while substantial, was not the type of virtually dispositive DNA evidence often encountered in criminal cases.  Unlike in other cases where the probability of a person other than the defendant being the depositor of the incriminating DNA is exceptionally small, here the prosecutor's DNA expert could only testify that while 98.6% of the "Caucasian" population was excluded as a depositor of the DNA, Fortson was not.  *Cf. People v. Wilson*, 2015 CO 54M, ¶ 7 (noting that DNA evidence established that there was less than a one-in-fifteen trillion chance that the DNA found on the victim belonged to someone unrelated to the defendant).

¶ 135    Fortson's DNA expert posited circumstances under which, even if the DNA belonged to Fortson, it could have been transferred to the victim's underwear absent unlawful sexual conduct by Fortson.  Fortson's expert also expressed the opinion that there simply was no scientific evidence that Fortson engaged in vaginal intercourse with the victim.

¶ 136    Put another way, this was not an open and shut case and the child sex assault expert's improper testimony could have played a significant role in the jury's determination of guilt.

¶ 137　For all of these reasons, I conclude that the expert testimony in this case deprived Fortson of a fair trial.  I would reverse his convictions on that basis as well as on the basis of the prosecutorial misconduct described in Judge Lichtenstein's opinion.

JUDGE WEBB, dissenting.

¶ 138    This is a plain error case, no more and no less.  "To constitute plain error, prosecutorial misconduct must have been so flagrant, glaring, or tremendously improper that the trial court should have intervened sua sponte." *People v. Cordova*, 293 P.3d 114, 121 (Colo. App. 2011).  Similarly, "we review the trial court's not granting a mistrial sua sponte under a plain error standard." *People v. Lafferty*, 9 P.3d 1132, 1136 (Colo. App. 1999).  In other words, while the first inquiry is what the prosecutor did, the second and more important inquiry is what the trial court should have done.

¶ 139    The majority says that the prosecutor "repeatedly brought before the jury uncharged acts of sexual assault." *Supra* ¶ 24.  While accurate, this statement gets the majority only so far.  Two unanswered questions — both pivotal to sound plain error analysis — echo throughout the majority opinion:

- What should the trial court have done, beyond stopping the prosecutor and cautioning the jury, as the court did?

- Why was the need for further action, apparently sua sponte declaring a mistrial, obvious?

¶ 140 Instead of answering these questions, the majority jumps into four instances of purported prosecutorial misconduct as grounds for reversal. Because a closer look through the narrow aperture of plain error review shows that each instance falls short, I respectfully dissent.

### I. The Plain Error Doctrine Sets a High Bar for Reversal

¶ 141 Everyone would agree that "[p]lain error review allows the opportunity to reverse convictions in cases presenting particularly egregious errors, but reversals must be rare." *Hagos v. People*, 2012 CO 63, ¶ 23. Simply put, "plain error is strong medicine." *People v. Ujaama*, 2012 COA 36, ¶ 40 (quoting *United States v. Simmonds*, 931 F.2d 685, 687 (10th Cir. 1991)).

¶ 142 This doctrine should provide a basis for relief in only limited circumstances, for three reasons.

- First, to "fault a trial court for failing to rule on an issue that had not been presented to it" is at best difficult, *Simmonds*, 931 F.2d at 688, and at worst "unfair to the trial court," *State v. Whitehorn*, 50 P.3d 121, 131 (Mont. 2002).

- Second, an accused should not be able to "withhold his objections until completion of his trial . . . and later complain

of matters which, if he had made a timely objection, would have allowed the trial court to take corrective action." *People v. Rollins*, 892 P.2d 866, 874 n.13 (Colo. 1995).

- Third, trial participants should be encouraged "to seek a fair and accurate trial the first time around." *Hagos*, ¶ 23 (quoting *United States v. Frady*, 456 U.S. 152, 163 (1982)).

¶ 143   Of these limiting principles, I am most concerned over basic fairness to the trial court.  After all, the court did exactly as it should have when faced with questionable prosecutorial conduct — shut the prosecutor down and cautioned the jury.  The court did both, not once but twice, and with very little help from defense counsel.  Yet, the majority still reverses, apparently believing that the prosecutorial misconduct was "so clear-cut, so obvious, a competent trial judge should be able to avoid it without benefit of objection." *People v. Taylor*, 159 P.3d 730, 738 (Colo. App. 2006).  I discern no lack of competence in the trial judge's handling of this trial.

## II.  Defendant Did Not Cite Section 16-10-301

¶ 144   The majority launches its analysis of error with a discussion of how the prosecutor failed to comply with section 16-10-301, C.R.S.

57

2017.  But this statute is not cited in Fortson's opening brief or his reply brief.  And therein lies the problem.  *See, e.g.*, *Vaughn v. King*, 167 F.3d 347, 354 (7th Cir. 1999) ("It is not the responsibility of this court to make arguments for the parties."); *Shankles v. Moore*, 205 So. 3d 1253, 1259 (Ala. Civ. App. 2016) ("It is not the duty of the appellate court to make arguments for the parties, nor is it the appellate court's duty to conduct the parties' legal research."); *State v. Hand*, 401 P.3d 367, 375 (Wash. Ct. App. 2017) ("We do not make arguments for the parties.") (*review granted* Dec. 6, 2017).

¶ 145    Because we cannot know how the Attorney General would have responded had Fortson raised this statute, I do not address it further.

### III.  Instances of Purported Prosecutorial Misconduct

#### A.  The Record Does Not Show Any Need — Much Less an Obvious Need — for the Trial Court to Have Intervened During the Prosecutor's Opening Statement

¶ 146    In her opening statement, the prosecutor said:

> I can't tell you that [the alleged instances of sexual misconduct] are the only incidents that occurred of Fortson sexually assaulting [the victim], but I can tell you that these are the two clearest incidences that she, thus far, has been willing to talk about.

Defense counsel did not object to this statement.

¶ 147    According to the majority, "[t]he prosecutor's statements implied that she knew of other instances in which Fortson had sexually assaulted [the victim], but that [the victim] could not, or would not, be telling the jury about them." *Supra* ¶ 48. But the prosecutor said no such thing. Indeed, the prosecutor's statement to some extent underplayed the victim's forensic interview, which as discussed below did suggest other misconduct by defendant against her.

¶ 148    Yet, even if the prosecutor made an improper statement, should the trial court have intervened sua sponte? No, for three reasons.

¶ 149    First, because language in opening statements rarely warrants reversal, the court had little reason to scrutinize the prosecutor's words and then speculate as to how the case would evolve. *See, e.g., People v. Bowles*, 226 P.3d 1125, 1132 (Colo. App. 2009) ("A prosecution's opening statement should be limited to evidence that will be adduced at trial. But remarks not supported by the evidence will constitute reversible error only on proof of bad faith and manifest prejudice.") (citation omitted). And uninformed by an

59

objection or argument, why would the court have suspected bad faith?

¶ 150    Second, this statement could not have been *obviously* improper.  The prosecutor did not say there *were* other instances of sexual misconduct that defendant had committed against the victim.  And the court would have had no reason to surmise that this general statement was unrelated to evidence which might be introduced.  For all the court knew, the prosecutor may have only been forewarning the jury of an anticipated defense attack on the victim's credibility because of inconsistencies in her outcries about alleged abuse.

¶ 151    Third, and most important, any of the court's concerns would have been assuaged by references to instances other than those charged in the video of the victim's forensic interview, which the court had reviewed to confirm compliance with the prosecutor's redaction request.  Because defense counsel had argued before trial that the entire video should be played, the court would have anticipated that the jury would hear them.  *People v. Melanson*, 937 P.2d 826, 836 (Colo. App. 1996) (concluding there was no evidence of bad faith where prosecutor indicated in opening statement that

two inmates who had been incarcerated with defendant would testify, but ceased questioning one inmate and never called the other when he learned of evidence that would have impeached the inmates' credibility).

¶ 152   In sum, the question is not the prosecutor's motive or intent, which the majority emphasizes, but whether — even assuming impropriety — the trial court's inaction constituted plain error. *Cordova*, 293 P.3d at 121.  The majority does not explain why the court should have interrupted the prosecutor's opening statement. The three reasons above show that any need for it to do so was far from obvious, as plain error requires.

### B.  Defense Counsel Urged That the *Entire* Video Recording of the Victim's Forensic Interview Be Played to the Jury

¶ 153   The majority points out that the prosecutor played the videotaped statement J.W. made to the forensic interviewers, and says that "it is improper for a prosecutor to knowingly, and for the purpose of bringing inadmissible matter to the attention of the judge or jury, offer inadmissible evidence."  *Supra* ¶ 44.  But wait. If admission of the video recording was not error — or at least not obvious error — then how can it have been a major component of,

in the words of the majority, "the pervasive nature of the misconduct in this case?" *Supra* ¶ 83.

¶ 154   We know that before the trial even began, defense counsel and the prosecutor fought at length over redactions from the video, *with defense counsel urging that the entire video be played.* Thus, from the trial judge's perspective, the entire video came in without objection, and only after defense counsel had argued that it should be admitted in its entirety. *See United States v. Yu-Leung*, 51 F.3d 1116, 1123 (2d Cir. 1995) ("This manifest pre-trial concern to guard against unfair prejudice through one type of 'irrelevant evidence' strongly suggests to us that [defense counsel] did not simply fall asleep at the wheel when another type of 'irrelevant evidence' was presented at trial.").

¶ 155   Of course, because the trial judge had reviewed the video in connection with pretrial proceedings on its admissibility, the court knew it included the victim's statements "that another girl, A.C., 'got raped' by Fortson, that Fortson had 'hurt more kids than me,' and that B.B. told her he 'raped other kids' and 'this was not the first time he did this.'" The court could well have perceived defense counsel's decision not to seek redaction of these statements from

the video as a strategic choice aimed at showing her propensity to exaggerate and embellish her accusations, as well as her animus toward Fortson.

¶ 156 Apparently, the majority would have had the judge suspend the proceedings after trial had begun and tell defense counsel that despite counsel's earlier contrary position, the attorneys should *again* go over the video and identify portions to be redacted. But what next? To avoid reversal, would the judge have to further review the video for further redactions, while the jury waited? Such a scenario makes no sense, logistically or logically.

¶ 157 Indeed, consistent with such a strategy, barely one page into defense counsel's closing argument he said, "[t]here are so many conflicts in her testimony, and so many embellishments as time goes on, that it raises reasonable doubt all by themselves." *See People v. Bondsteel*, 2015 COA 165, ¶ 130 ("[T]he record creates a strong inference that defense counsel did not object to these statements as a matter of strategy rather than due to inadvertence.") (*cert. granted* Oct. 31, 2016). This argument shows that the defense position of letting the jury hear the entire interview

was not limited to the earlier rape shield dispute, as the majority suggests.

¶ 158    As well, the video recording shows why the prosecutor's later actions, even if questionable in hindsight, at worst repeated what the jury had already heard.  And for that reason, any later error could not be plain.  *See People v. Fuller*, 788 P.2d 741, 748 (Colo. 1990) ("The admission of Mrs. Story's testimony was not plain error for the additional reason that the substantial amount of evidence of the defendant's motive and the defendant's guilt made Mrs. Story's testimony cumulative."); *People v. Douglas*, 2015 COA 155, ¶ 41 ("Where the improperly admitted lay testimony is cumulative of properly admitted expert testimony, there is no plain error."); *People v. Joyce*, 68 P.3d 521, 524 (Colo. App. 2002) (concluding that the admission of certain hearsay statements was not plain error when such evidence was "merely cumulative").

¶ 159    In sum, the majority's attack on the prosecutor for offering the entire video into evidence, and the trial judge's failure to limit its admission, falls flat.

C.  During Cross-Examination of the Victim's Friend, A.K., the Trial Court Stopped the Prosecutor and Cautioned the Jury

¶ 160    Defense counsel called the victim's friend, A.K.  During cross-examination, the prosecutor asked five questions.  All of them posited statements that the friend had made during her forensic interview.  Two dealt with repetition of statements by the victim concerning inappropriate touching by Fortson.  The others repeated accusations made by three different girls of Fortson's improper conduct against them.  The friend denied having made any of these statements.

¶ 161    Following the fifth question, the court summoned counsel to the bench, expressed concern over CRE 404(b), and told the prosecutor to move on.  Fortson neither requested a cautionary instruction nor moved for a mistrial.  Still, the court told the jury that it should be concerned only with the defendant's conduct in the two charged offenses.  Defense counsel did not dispute the adequacy of this instruction.

¶ 162    So, where is the impropriety?  The prosecutor's questions sought to set up impeachment based on the friend's prior inconsistent statements during her forensic interview.  Defense counsel did not challenge the prosecutor's good faith basis for setting up the impeachment, as would be expected if the friend had

65

not made such statements to the interviewer. Nor did defense counsel claim surprise because the recording of that interview had not been produced by the prosecution.

¶ 163 The majority is correct that the record does not show a good faith basis for asking these questions. That is so because the recording of the friend's interview was not included. But the court's admonition to move on left the prosecutor with no reason to make an offer of proof, such as by directing the court to the recording, especially where defense counsel had not requested one.

¶ 164 Despite all of this, the majority says that the prosecutor's "plan was to ask legally objectionable questions to elicit the highly prejudicial evidence of Fortson's uncharged sexual acts (and only then, to impeach A.K.'s faulty memory . . . )." *Supra* ¶ 37. The majority infers that impeachment was not the prosecutor's primary — and entirely proper — purpose because the prosecutor had not first complied with CRE 404(b) as to "Fortson's uncharged sexual acts."

¶ 165 But for three reasons, I would not so facilely infer a corrupt intent by the prosecutor to circumvent the procedural requirements of CRE 404(b). First, the prosecutor was doing just as CRE 613(a)

requires — calling A.K.'s attention to the particulars of the prior inconsistent statements. Second, evidence improper for one purpose (propensity, according to the majority), may be proper for another (impeachment with prior inconsistent statements). *See* CRE 105. And third, evidence admissible for a limited but proper purpose does not become inadmissible "merely because the jury might have improperly considered it" for a purpose other than that for which it was admitted. *Hansen v. Lederman*, 759 P.2d 810, 813 (Colo. App. 1988).

¶ 166 Nor does the majority cite authority ignoring CRE 105 merely because the impeaching evidence would otherwise be subject to the strictures of CRE 404(b). Our supreme court has held to the contrary. *People v. Segovia*, 196 P.3d 1126, 1130 (Colo. 2008) ("Thus, evidence of specific acts used solely for impeachment is governed by rule 608(b), rather than rule 404(b)."); *accord People v. Thomas*, 2014 COA 64, ¶ 39 (citing *Segovia*). While the contemplated impeachment here was under CRE 613(a) rather than under CRE 608(b), in terms of *Segovia*'s rationale, that is a distinction without a difference.

¶ 167    If *Segovia* is not dispositive because it involved other acts

evidence offered by defense counsel rather than by the prosecution,

then the application of CRE 404(b) to impeachment evidence is

unresolved in Colorado.[1]  Obviousness under plain error requires

controlling Colorado law.  *See, e.g.*, *People v. Stroud*, 2014 COA 58,

¶ 33 ("However, where there is no case law or statute concerning a

trial court's alleged error, we cannot conclude that the trial court's

decision constituted plain error because the error would not have

been obvious."); *People v. Zubiate*, 2013 COA 69, ¶ 24 ("An error

may be obvious if the issue has been decided by a division of this

---

[1] Out-of-state authority is divided.  *Compare State v. Kelly*, No. 35786-1-II, 2009 WL 1486589, *7 (Wash. Ct. App. May 27, 2009) (unpublished opinion) (CRE 404(b) "only applies to prior misconduct offered as substantive evidence, not evidence offered for impeachment."), *with Petric v. State*, 157 So. 3d 176, 201 (Ala. Crim. App. 2013) ("[W]e hold that Rule 404(b) . . . requires that the prosecution 'provide notice, regardless of how it intends to use the extrinsic-act evidence at trial, i.e., during its case-in-chief, for impeachment, or for possible rebuttal.'") (citations omitted).

    In the federal system, some circuits have held the requirement applicable.  *See, e.g., See United States v. Bradley*, 644 F.3d 1213, 1273 (11th Cir. 2011).  But the Tenth Circuit treats Fed. R. Evid. 404(b) as applying only to substantive evidence.  *See United States v. Watson*, 766 F.3d 1219, 1244-45 (10th Cir. 2014) ("When a defendant, like Mr. Watson, challenges evidence under Rule 404(b) that was admitted solely for impeachment purposes, we need not pursue the Rule 404(b) challenge any further.").

court or the Colorado Supreme Court, or if the trial court has erroneously applied statutory law."), *aff'd*, 2017 CO 17.

¶ 168 True, the trial court eventually became concerned over the CRE 404(b) implications of the questioning. Importantly, then the court did just what it would have done had defense counsel objected — shut the prosecutor down and cautioned the jury. Because the court had no obligation sua sponte to give a cautionary instruction, the instruction that it gave is beyond plain error review. *See, e.g., People v. Mersman,* 148 P.3d 199, 203 (Colo. App. 2006) ("[T]o receive a curative instruction, a defendant must request it, and a trial court does not commit plain error if it does not give a curative instruction sua sponte.").

¶ 169 Perhaps the court should have stepped in earlier. But the court may have been slow to react because the jury had already seen on the video of the victim's forensic interview — which defense counsel had urged to be played in its entirety — her assertion that defendant had "raped other kids, but I don't know, but I don't know, all he told me it was not the first time he done it." Under these circumstances, would retrospectively drawing such a fine line — somewhere after the first but before the fifth of these consecutive

69

questions — be consistent with the obviousness requirement of plain error? I think not.

### D. During the Prosecutor's Closing Argument, the Trial Court Again Stopped the Prosecutor and Cautioned the Jury

¶ 170    In closing argument, the prosecutor made two references to uncharged prior sexual misconduct by Fortson.

### 1. First Reference

¶ 171    The prosecutor expressed skepticism that the first incident of sexual abuse was the charged offense of defendant "taking [the victim] out in the backyard and licking her vagina, it's just not. There's going to be other incidents." Unsurprisingly, defense counsel objected to this statement.

¶ 172    The court admonished the prosecutor and directed her not to continue discussing uncharged misconduct. Then the court instructed the jury: "Count number 1, the sexual assault on a child, pattern of abuse, relates only to two incidents, the alleged licking of the vagina and the alleged sexual assault in the . . . home." The court reiterated that the only alleged incidents of sexual misconduct by Fortson were the two with which he had been charged.

¶ 173    As with attempted impeachment of the friend, one might

wonder — what else could the court have done?  Of course, had

defense counsel wanted a more forceful instruction, he could have

asked for one.  But he did not.  Nor did he move for a mistrial.

### 2.  Second Reference

¶ 174    Later in her closing argument, the prosecutor said that the

child abuse expert had testified "that [the victim's] disclosures could

be consistent with other incidents" of sexual assault.  Again,

defense counsel objected.  At the bench, the court held a discussion

with the attorneys.

¶ 175    But what was said is not in the record on appeal.  For all that

we know, defense counsel may have withdrawn his objection after

having been reminded that the expert had affirmatively answered

the prosecutor's question, "so can kids take different situations that

have happened over a long period of time or at different events and

squish them together as though they happened all at the same

time?"  Or defense counsel may have declined the court's offer of a

second cautionary instruction, for fear of overly emphasizing the

prosecutor's comment.

¶ 176    We know only that after this conference, the court did not say anything further to the jury. To the extent that the unreported conference may have affected the court's failure to take further action, defendant bears the burden of certifying an adequate record. *See, e.g., People v. Clendenin*, 232 P.3d 210, 216 (Colo. App. 2009) (It is the defendant's duty to provide the reviewing court with an adequate record that substantiates the claim on appeal, and, "[a]bsent an adequate record, we presume the trial court's findings and conclusions are correct.").

¶ 177    Likewise, I would assume that the record supports the court's inaction. Nor is this assumption unfair to defendant. Appellate counsel could have requested a remand for the trial court and the parties to reconstruct this portion of the record. For example, in *People v. Ellis*, 148 P.3d 205, 208 (Colo. App. 2006), Ellis filed a motion on appeal for a limited remand to reconstruct the record of voir dire proceedings, which was granted by this court. The trial court held a hearing to reconstruct the record of voir dire proceedings and reconstructed that part of the record, and, subsequently, the appeal was recertified.

## IV. The Record Does Not Show an Obvious Need to Have Sua Sponte Ordered a Mistrial or Any Other Substantial Doubt Over the Reliability of the Conviction

¶ 178    In the end, two principles overshadow this appeal.  First, "a defendant, though entitled to a fair trial, is not entitled to a perfect trial." *People v. Stewart*, 2017 COA 99, ¶ 79.  Second, "because courts do not reverse convictions to punish prosecutors, *see Crider v. People*, 186 P.3d 39, 44 (Colo. 2008), defendant must show the arguments so undermined the trial's fundamental fairness as to cast doubt on the judgment's reliability." *People v. McBride*, 228 P.3d 216, 221 (Colo. App. 2009).

¶ 179    Was this trial perfect?  Probably not.  Because few are, perfection is not the metric of the trial court's competence.

¶ 180    Yet, the majority persists in punishing the prosecutor — and by implication impugning the trial judge's competence — for any imperfections, rather than laying them at the feet of Fortson's trial counsel and his appellate counsel.  To be sure, Fortson may have a remedy under Crim. P. 35(c).  *See People v. Alley*, 232 P.3d 272, 274 (Colo. App. 2010) ("This claim is better suited to a Crim. P. 35(c) motion because the trial court is in a position 'to develop facts

necessary to determine adequacy of representation during an entire trial.'") (citation omitted).

¶ 181  Instead of punishing the prosecutor, I look for doubt about the conviction's reliability — the penultimate requirement for reversal under plain error review — but see none.

¶ 182  To begin, I discern no impropriety in the prosecutor's opening statement, much less sufficient impropriety to meet the obviousness requirement for finding plain error in the trial court's failure sua sponte to intervene.  Beyond that, the prosecutor's single and oblique reference to other misconduct against the victim could hardly have prejudiced the jury.  *See People v. Carian*, 2017 COA 106, ¶ 58 ("The comments were also fleeting relative to the argument as a whole and in light of all the evidence the jury heard after opening statements.").

¶ 183  As for the prosecutor's cross-examination of A.K., again I discern no impropriety.  But to the extent that the trial court, in its discretion, felt otherwise, the court did just what it should have done — shut the prosecutor down and cautioned the jury.

¶ 184  Cases finding reversible prejudice when the court sustains an objection are rare.  *See People v. Douglas*, 2012 COA 57, ¶ 65

("However, defendant's contemporaneous objection to the comment was sustained, and he requested no further relief. Accordingly, we need not consider this alleged error."). Even more rare is reversal when the court also gives a cautionary instruction, as it did here. *See People v. Gable*, 184 Colo. 313, 317, 520 P.2d 124, 127 (1974) ("[T]his was not reversible error in light of the written cautionary instruction.").

¶ 185 Turning to closing argument, the prosecutor's reference to "other incidents" is puzzling. Even so, as with the questioning of the friend, again the court stopped the prosecutor dead in her tracks and let the jury know of the court's feelings, in no uncertain terms. Defense counsel did not request a mistrial. As the Tenth Circuit observed in a similar case,

> [w]hatever improper conduct may have occurred, the district court did not plainly err by failing to grant a mistrial. In light of the jury instruction that closing argument is not evidence, the court's sustaining [the defendant's] objection, and especially the strength of the evidence against him, the district court was not clearly obligated to grant a mistrial sua sponte.

*United States v. Anaya*, 727 F.3d 1043, 1059 (10th Cir. 2013).

¶ 186    Given all this, I do not discern the type of prejudice in the prosecutor's closing argument that cries out for reversal because the trial court did not sua sponte order a mistrial.  On the one hand, no details concerning such other incidents were provided.  *See People v. Herdman*, 2012 COA 89, ¶ 46 (holding that admission of prior incidents of cocaine use did not warrant reversal when testimony of incidents was not detailed and the defendant did not move to strike testimony or request a limiting instruction); *cf. People v. Rivas*, 77 P.3d 882, 892 (Colo. App. 2003) ("Here, the investigating officer's statements were ambiguous, vague, and brief.").  And on the other hand, the jury had already seen far worse accusations on the victim's video interview — which defense counsel had urged to be played in its entirety.  *See People v. Pack*, 797 P.2d 774, 775 (Colo. App. 1990) ("[T]he statement was cumulative, and therefore, the court's failure to analyze this issue under [CRE] 803(2) does not require reversal.").

¶ 187    Finally, as to the prosecutor's reference to testimony by the expert witness, that witness had given similar testimony, without objection.  The majority cites no authority, nor am I aware of any in Colorado, holding a prosecutor's reference to such testimony error,

76

much less plain error. *See People v. Medina*, 51 P.3d 1006, 1017 (Colo. App. 2001) ("A prosecutor is entitled to comment on evidence admitted at trial and to argue all inferences that can be reasonably and fairly drawn from such evidence."), *aff'd sub nom. Mata-Medina v. People*, 71 P.3d 973 (Colo. 2003). While a complete record might afford a basis for further scrutiny, defendant did not provide it.

¶ 188    For these reasons, I discern no obvious error and therefore would affirm.